```
          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
                    EASTERN DIVISION
```

```
MICHAEL MARCAVAGE, et al.,        )
                                  )
                  Plaintiffs,     )
                                  )
     v.                           )    No.  06 C 3858
                                  )
CITY OF CHICAGO, et al.,          )
                                  )
                  Defendants.     )
```

## MEMORANDUM OPINION AND ORDER

Numerous plaintiffs--Michael Marcavage ("Marcavage"), James Deferio ("Deferio"), Faith Deferio, Craig Scarberry and Ryan Murphy ("Murphy")--have filed a First Amended Complaint ("FAC") against the City of Chicago ("Chicago"), the Metropolitan Pier and Exposition Authority ("Authority") and several Chicago Police Officers in their official and individual capacities, charging each with violations of plaintiffs' constitutionally or statutorily protected civil rights. For its part, Chicago has moved under Fed. R. Civ. P. ("Rules") 12(b)(1) and 12(b)(6) to be dismissed as to the potential theories for recovery set out in FAC Counts IV-VIII. For the reasons stated in this memorandum opinion and order, Chicago's motion is denied in its entirety.

## Motion To Dismiss Standards

When considering the sufficiency of a complaint under either Rule 12(b)(6) or Rule 12(b)(1), a court must accept all of the complaint's well-pleaded factual allegations as true and draw all reasonable inferences in plaintiff's favor (McMillan v.

<u>Collection Prof'ls, Inc.</u>, 455 F.3d 754, 758 (7th Cir. 2006)
(Rule 12(b)(6); <u>Alicea-Hernandez v. Catholic Bishop of Chicago</u>,
320 F.3d 698, 701 (7th Cir. 2003)(Rule 12(b)(1)).  While a Rule
12(b)(1) inquiry tests the sufficiency of the allegations to
establish subject matter jurisdiction, a Rule 12(b)(6) review
measures whether the complaint states a claim for which relief
could be granted.  Under Rule 12(b)(6) no complaint will be
dismissed unless "it is clear that no relief could be granted
under any set of facts that could be proved consistent with the
allegations" (<u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73 (1984)).
What follows, then, is a summary of the allegations set forth in
the FAC that, for now, must be accepted as true.

FAC

Plaintiffs are all volunteers for Repent America, a
Christian ministry based in Philadelphia with some 10,000 other
volunteers across the country (FAC ¶5).  One significant tenet of
their beliefs is that plaintiffs "are obligated to tell as many
other people as they can about what they believe is their
individual need to be 'born again,' that is, to be reconciled to
God" (FAC ¶7).  That mandate is chiefly furthered through the
distribution of religious literature and "one-on-one discussion
in the public square," which may take the form of leafleting
passers-by on public sidewalks (FAC ¶¶8-9).  That practice
brought plaintiffs to Chicago in July 2006 (FAC ¶16).

At that time Chicago was hosting the "Gay Games," a major civic event at venues across the city, including Navy Pier, Soldier Field and Wrigley Field (FAC ¶¶20, 21, 37). In the words of Chicago's Mayor Daley, the city viewed that event as a "showcase" for the city in its pending bid for the Olympics (FAC ¶20). In an effort to burnish the city's reputation, Chicago "sought to promote the Gay Games and to discourage protest or disagreement with the viewpoints and activities expressed and endorsed by the Gay Games." (id.) Part of that policy was to set up designated "free speech zones" near the events (FAC ¶¶16, 28).

For their part, plaintiffs apparently also saw that event as a useful opportunity for their ministry. On multiple occasions during the Gay Games they attempted to leaflet and otherwise engage the public with their "Gospel" message on public sidewalks and parks adjacent to Gay Games events (FAC ¶¶9, 16, 21, 31). Their efforts, however, were summarily thwarted by officers of the Chicago Police Department. First, while they were distributing their literature on a sidewalk just below Soldier Field on July 15, 2006, a police officer ordered them to leave or be arrested (FAC ¶16). At some point another officer explained that they had to stand in one of the "free speech zones" (id.).

On the following day, just as plaintiffs were arriving at Navy Pier, a group of security officers of the Authority (the state unit that owns Navy Pier and the adjacent Gateway Park)

ordered plaintiffs out of Navy Pier to Gateway Park (FAC ¶21).
Chicago police arrived momentarily and roughly escorted
plaintiffs across the street into the park (id.). Once there,
two of the officers (among the defendants in this case) warned
plaintiffs that the park was also off limits to them (FAC ¶22).

After Marcavage attempted to dial 911 to speak with a police
supervisor, one of the officers took the phone away from him,
handcuffed him and forced him to the ground (FAC ¶23). Deferio,
one of Marcavage's associates attempting to videotape the
incident, was also handcuffed and ordered to the ground (his
camera was confiscated and later returned without the tape)(id.).
Another officer brought down Murphy in a headlock (FAC ¶¶23-24).
When a female officer arrived on the scene, she ordered that
Marcavage be released but that Murphy and Deferio be taken into
custody (they were accused of criminal trespass, but were
released several hours later when the Authority did not press
charges)(FAC ¶¶24-27).

Not yet deterred, Marcavage and other plaintiffs stood on a
public sidewalk outside of Wrigley Field the following Saturday
(July 22) holding a sign that read "that his sincerely-held
religious belief [was] that marriage is between one man and one
woman" (FAC ¶31). Also working the sidewalks outside the
Friendly Confines that day, in plain view of the police and
security personnel on the scene, were other persons expressing

4

their own views: a man leafleting about a documentary, a person waving a "homosexual pride flag" and another with a sign speaking out against President Bush (FAC ¶32).

As before, Marcavage and his associates were approached by a police officer (another defendant) who informed them that the sidewalk "was not open to the public or free speech" and that they had to cross to the other side of the street (FAC ¶33). Marcavage attempted to educate the officer about his right to the use of the sidewalk, but the officer would have none of it and arrested him (id.). After being taken to the station house, Marcavage was charged on a trumped-up accusation of disorderly conduct (FAC ¶36).

While Marcavage was being processed, another officer (also a defendant) queried whether he had ever heard of Deputy Chief Daniel Dugan ("Dugan")(FAC ¶37). Marcavage had in fact had a run-in with Dugan at the opening ceremony of the Gay Games at Soldier Field (id.). According to the officer, Dugan thought that Marcavage was "bad news" and Dugan was responsible for Marcavage's arrest (id.). That officer also informed Marcavage that Dugan "was working under the direction and implementing the policies of the Police Superintendent and the Mayor, having been assigned to handle all the affairs of the 'Gay Games'" (id.). Marcavage was not released until 9:35 p.m. that night (FAC ¶40).

As plaintiffs see it, Chicago has trammeled their

constitutional or statutory rights of freedom of speech, religious exercise, equal protection and freedom from unreasonable search and seizure through the repeated discriminatory enforcement of Chicago's "content-based policy favorable to the views of the Gay Games" (FAC ¶20). They claim that Chicago policy has prevented them from engaging in their ministry and communicating with the intended audience for their Gospel, and they fear the same response upon their return trips to the city (FAC ¶¶11, 40).

## **Monell, Leatherman** and **McCormick**

Chicago predictably offers an initial blanket argument that plaintiffs have not sufficiently charged it with any constitutional violation that can survive <u>Monell v. Dep't of Soc. Servs. of the City of New York</u>, 436 U.S. 658 (1978). For plaintiffs to recover for their alleged constitutional injuries, their Complaint must state a claim for relief under 42 U.S.C. §1983 ("Section 1983"). And <u>Monell</u>, 436 U.S. at 690-91 held that a municipality is liable under Section 1983 only if it caused a constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." <u>Monell</u> rejected respondeat superior

6

liability and concluded that municipalities could be held liable only when an injury was inflicted by a government's "lawmakers or by those whose edicts or acts may fairly be said to represent official policy" (<u>id</u>. at 694).

Those principles have been summarized in the now familiar three-branch formulation repeated in <u>Roach v. City of Evansville</u>, 111 F.3d 544, 548 (7th Cir. 1997)(internal quotation marks omitted) and a host of other cases:

> Before the City can be liable under Section 1983, the plaintiff must show either (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

Chicago argues that the FAC has alleged none of those things--not a "policy" nor a "custom" nor a decision by an individual with final policymaking authority that could have caused their constitutional injury.

So far, so good. City's argument goes astray, however, with this statement (at its Mem. 5)--a statement predicated on some now-discredited cases in a line emanating from <u>Strauss v. City of Chicago</u>, 760 F.2d 765, 767-69 (7th Cir. 1985):

> Facts indicating the existence of the policy must be specifically plead [sic].

That statement is unquestionably not good law,[1] and it is, in candor, surprising that Chicago is still venturing to raise that argument fully six years after our Court of Appeals' decision in McCormick v. City of Chicago, 230 F.3d 319, 323-24 (7th Cir. 2000)--and more than 13 years after the Supreme Court's unanimous opinion in Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993).

As far back as 1993 Leatherman held definitively that there is no such "heightened pleading standard" under Monell. Monell claims, just like every other civil claim in federal court not included within the specific exceptions set out in Rule 9(b), are governed by Rule 8(a)(2)'s notice pleading mandate, which "requires that a complaint include only 'a short and plain statement of the claim showing that the pleader is entitled to relief'" (Leatherman, 507 U.S. at 168).

Although that alone should have educated Chicago's counsel to abandon reliance on such cases as Strauss, in 2000 McCormick, 230 F.3d at 323-24 (citations and internal quotation marks omitted) repeated the Leatherman canon:

> The Supreme Court has made it very clear that federal courts must not apply a heightened pleading standard in civil rights cases alleging §1983 municipal liability.

---

[1]    Indeed, this Court has been sharply critical of Strauss and its progeny from the very beginning, and it consistently sought to cabin that holding until Leatherman, and even more recently another unanimous opinion in Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512-13 (2002) confirmed its illegitimacy.

> To survive a motion to dismiss, a pleading must only
> contain enough to allow the court and the defendant to
> understand the gravamen of the plaintiff's complaint.

In the face of those decisions, Chicago does not cite a single
post-McCormick case for the ill-considered assertion that Monell
somehow created a fact-pleading carveout to the federal notice-
pleading regime.

With that misleading underbrush cleared away, the relevant
question is whether the FAC contains "sufficient allegations to
place the court and defendants on notice of the gravamen of the
complaint" (Latuszkin v. City of Chicago, 250 F.3d 502, 504 (7th
Cir. 2001)).  Plaintiffs' allegations certainly do just that in
at least one regard (which is all that is necessary):  Chicago's
Mayor, with either formally enacted or delegated authority to do
so, had promulgated a discriminatory and content-based policy
that when enforced against plaintiffs led officers of the Chicago
Police Department to arrest them and otherwise infringe on their
First-Amendment-protected activity (FAC ¶¶20, 37, 76).  That
policy, for example, directed the police to select out plaintiffs
for harassment and arrest because of their speech, while other
speakers--more congenial to the atmosphere of the Gay Games--only
a few yards away were let be (FAC ¶¶32, 33, 37).

In its reply Chicago attempts to save its argument by citing
to cases such as Latuszken, 250 F.3d at 505 that found
insufficient pleaded facts to give the municipalities in question

fair notice of the gravamen of the plaintiffs' claims there. Those cases are inapposite to the situation in this case. For example, Latuszken, 250 F.3d at 505 found the plaintiff in that case had made allegations only about the policy of the Chicago Police Department, which does not suffice to charge a policy of Chicago itself. By contrast, here plaintiffs have generally alleged a Chicago policy and the nature of that policy (FAC ¶20) and have attached that policy to Mayor Daley himself (FAC ¶37). Those allegations are entirely sufficient in the post-Leatherman world (see McCormick, 230 F.3d 324-25).

To establish as a matter of law that Chicago could not possibly have any such official policy that ran afoul of the First Amendment, Chicago points to the decades-old consent decree ("Decree") entered into by Chicago as reported in Alliance To End Repression v. City of Chicago, 561 F.Supp. 537 (N.D. Ill. 1982). That Decree, which generally forbids Chicago officials from infringing First Amendment rights, has been recognized by various courts (including this one) as reflecting official Chicago policy (see, e.g., Limes-Miller v. City of Chicago, 773 F.Supp. 1130, 1137 (N.D. Ill. 1991)). Given that Decree's prohibitions, Chicago argues that any Chicago police officer (or even Mayor Daley) who did anything that could be construed as violating plaintiffs' First Amendment rights would necessarily be acting in violation--not in furtherance--of Chicago policy, so that Chicago

cannot be liable for those actions under <u>Monell</u>.

That argument goes too far. Simply having that prohibition on the books cannot shield Chicago from the possibility that it has adopted other official policies that in fact violate an individual's First Amendment rights and would thus be actionable under <u>Monell</u>.[2] Instructive on that point is Justice O'Connor's response for a plurality of the Supreme Court to a concern raised in Justice Brennan's concurrence in <u>City of St Louis v. Praprotnik</u>, 485 U.S. 112, 130-31 (1988)(internal quotation marks and citation omitted):

> We nowhere say or imply, for example, that a municipal charter's precatory admonition against discrimination or any other employment practice not based on merit and fitness effectively insulates the municipality from any liability based on acts inconsistent with that policy. Rather, we would respect the decisions, embodied in state and local law, that allocate policymaking authority among particular individuals and bodies. Refusals to carry out stated policies could obviously help to show that a municipality's actual policies were different from the ones that had been announced.

Or take now Chief Judge Easterbrook's observation for our Court of Appeals in <u>Auriemma v. Rice</u>, 957 F.2d 397, 399 (7th Cir.

---

[2] This Court, for example, even while recognizing the Decree as official Chicago policy in <u>Limes-Miller</u>, 773 F.Supp. at 1137-38, addressed the possibility that some official policymaker could have sanctioned the unconstitutional activity or that some custom had arisen in the office of the Commissioner of Personnel that would be attributable to the city under <u>Monell</u>. But the judgment in <u>Limes-Miller</u> (made on a Rule 56 summary judgment motion, not on a motion to dismiss) resulted from the failure of the plaintiff there to have adduced any facts, after full discovery, of such a decision or custom.

1992):

> Even executive action in the teeth of municipal law
> could be called policy.  It would not twist the
> language to say that for a long time Chicago's policy
> was to use public employment to reward political
> friends and punish political enemies, even though state
> and local law required merit selection for many
> positions.  A practice undertaken by the executive
> power and suffered by the legislative power may be said
> to reflect a custom with the force of legislation.

In light of those principles, this Court simply cannot say

without further development of the record that Mayor Daley does

not make official policy in Chicago (whether that authority is

given positively by state law or has been arrived at through

custom) as to police enforcement or the staging of major events

within the city that could run afoul of plaintiffs' constitu-

tionally protected rights.  <u>Auriemma</u>, 957 F.2d at 399, with its

holdings that the police superintendent and then Mayor Washington

did not have final policymaking authority in the field of

personnel decisions and that there was no custom with the force

of law evidenced in the factual record, does not preclude the

possibility that Chicago's Mayor could create <u>Monell</u>-actionable

policy for the city in another area and on a different factual

record despite the Decree.[3]  Plaintiffs are entitled to the

---

[3]  It is also worth noting that even with the Decree on the
books, Chicago may have other positive legislation that
nonetheless violates the First Amendment (see, e.g., <u>Weinberg v.
City of Chicago</u>, 310 F.3d 1029 (7th Cir. 2002)).  Legislators are
scarcely infallible in their judgments of what is and what is not
permissible under the First Amendment.

opportunity, through discovery, to develop the facts that can show the existence of the policies that they allege are actionable under Monell.

First Amendment

Next Chicago argues that plaintiffs' challenge to the policy of using "Free Speech Zones" during events such as the Gay Games should be dismissed for want of subject matter jurisdiction because Plaintiffs lack standing to bring such a claim. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)(citations and quotation marks omitted, ellipses in original) announced this three-step test for Article III standing:

> First, the plaintiff must have suffered an injury in fact--an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of--the injury has to be fairly...traceable to the challenged action of the defendant, and not...the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

And the burden of establishing those elements lies on the plaintiff seeking federal jurisdiction (id. at 561; see also Lee v. City of Chicago, 330 F.3d 456, 468 (7th Cir. 2003)).

In this instance plaintiffs' allegations sufficiently meet each of those elements. Indeed, Chicago really challenges only the initial injury-in-fact requirement, arguing that because plaintiffs allege that they were never in fact placed in a free

13

speech zone set up by Chicago, they were not actually injured by
any constitutional infirmities that the free speech zone policy
might have had (Chicago Mem. 11-12).

That argument, however, turns things somewhat inside out.
It is not the mere creation of free speech zones or their
physical locations as such that are at the root of the injury to
plaintiffs' First Amendment rights.  Instead the injury is that
under Chicago's policy plaintiffs were not permitted to engage in
their ministry in the public forums of their own choosing:  the
sidewalks outside of Soldier Field and Wrigley Field (FAC ¶¶16,
31).  What plaintiffs are really asserting is that their
exclusion from those areas caused by Chicago's policy during the
Gay Games is an injury in fact that this Court can redress by
finding that the policy is unconstitutional as applied to
plaintiffs.  That assertion meets all of the requirements for
standing.

In advancing that challenge, as plaintiffs have clearly
recognized, it is appropriate for them to put those free speech
zones at issue, so as to undermine any contention by Chicago that
those designated areas provided a sufficient alternative channel
of communication under First Amendment time, place and manner
review (see, e.g., <u>Weinberg</u>, 310 F.3d at 1041).  But for standing
analysis that is neither here nor there.

Chicago's Mem. 13-14 also contends that plaintiffs have

failed to state a claim on the merits in their challenge to
Chicago's policy, because such free speech zone schemes have
repeatedly been upheld by the courts.  That argument too is
entirely unavailing.

As already observed, plaintiffs' allegations have put at
issue whether Chicago's policy during the Gay Games, which
prevented them from conducting their ministry in their chosen
public forums, was a valid time, place and manner restriction.
That claim is governed by cases exemplified by <u>Ward v. Rock
Against Racism</u>, 491 U.S. 781, 791 (1989), quoting <u>Clark v. Cmty.
for Creative Non-Violence</u>, 468 U.S. 288, 293 (1984):

> Our cases make clear, however, that even in a public
> forum the government may impose reasonable restrictions
> on the time, place, or manner of protected speech,
> provided the restrictions "are justified without
> reference to the content of the regulated speech, that
> they are narrowly tailored to serve a significant
> governmental interest, and that they leave open ample
> alternative channels for communication of the
> information."

Without question plaintiffs' allegations state a claim under that
analysis.

First, plaintiffs have specifically alleged that Chicago's
policy was not in fact content-neutral:  Rather, they were
singled out because Chicago did not want them expressing their
views about marriage and other topics near the Gay Games events,
while Chicago allowed others to express their own views (as to
President Bush, for example) in the very same locations (FAC

¶¶20, 32, 33). Second, they have alleged that the restriction was not narrowly tailored to serve a significant city interest, because there was not an actual need for crowd control around the event sufficient to justify the restriction (FAC ¶¶17, 31). Third, as already noted, they have suggested that the free speech zones were insufficient as alternative channels of communication because those areas would prevent adequate contact with the public (FAC ¶29).

If, when their present allegations are fleshed out by factual development, plaintiffs can successfully put any one of those elements at issue, the burden will rest on Chicago to come forward with evidence justifying its policy--and if Chicago fails in that effort, plaintiffs may prevail (see, e.g., Weinberg, 310 F.3d at 1038-40). Hence the dismissal of plaintiffs' claim at the inception of the case is uncalled for. Chicago should be aware that none of its cited cases upholding free-speech-zone type policies is to the contrary, for each was decided at a different stage of litigation after careful factual inquiry (see, e.g., Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8 (1st Cir. 2004)).

## Equal Protection

What has been said to this point confirms that plaintiffs' allegations have stated at least one claim for relief, so that it is unnecessary to go any further to deny Chicago's dismissal

motion.  But because a few other issues have also been sufficiently posed by the parties' briefs, this opinion will take the opportunity to address them.

First, plaintiffs also believe they are entitled to recover under a Fourteenth Amendment equal protection theory.  As <u>Police Dep't v. Mosley</u>, 408 U.S. 92, 94-95 (1972) instructs, an allegation that city policy treats the speech of one group differently from that of another group does state a claim under the Equal Protection Clause.  In this case, for example, plaintiffs have specifically alleged that Marcavage was singled out and arrested because of the content of his speech pursuant to Chicago policy, while others occupying the same sidewalk outside of Wrigley Field at the same time were allowed to continue similar activity expressing an opposite viewpoint (FAC ¶¶32-33, 37).  Such a policy, if true, is impermissible under the Equal Protection Clause (just as it is under the First Amendment) unless it is justified by a compelling government interest--see, e.g., <u>Burson v. Freeman</u>, 504 U.S. 191, 197 n.3 (1992)(Blackmun, J.); <u>Mosley</u>, 408 U.S. at 96, 99.

Even if it were to turn out that Marcavage alone was singled out by Chicago (a possibility suggested by FAC ¶37), he could still proceed under a "class of one" equal protection theory should he be able to establish the requisite animus toward him or, perhaps alternatively, the absence of a rational basis for

his different treatment.  In that regard see, e.g., <u>Aida Food &</u>
<u>Liquor, Inc. v. City of Chicago</u>, 439 F.3d 397, 402-03 (7th Cir.
2006) and the more extended discussion of the "class of one"
doctrine in <u>Smith v. City of Chicago</u>, 457 F.3d 643, 652 (7th Cir.
2006).

Chicago nonetheless argues that plaintiffs cannot recover
under any equal protection theory because Chicago could
legitimately draw a purposeful distinction between plaintiffs and
the Gay Games participants (Chicago Mem. 5).  That argument is
flawed on two grounds.

First, it is based on an incorrect standard of review.
Chicago suggests that rational-basis review should apply, but so
long as plaintiffs' allegations (and, later, the evidence)
support the theory that Chicago was purposefully discriminating
as to speech (a fundamental right), strict scrutiny applies--and
that means the policy must be justified by a compelling
governmental interest (contrast <u>Civil Liberties for Urban</u>
<u>Believers v. City of Chicago</u>, 342 F.3d 752, 766 (7th Cir.
2003)("<u>Urban Believers</u>") with <u>Vineyard Christian Fellowship of</u>
<u>Evanston, Inc. v. City of Evanston</u>, 250 F.Supp.2d 961, 975-77
(N.D. Ill. 2003) ("<u>Vineyard</u>")).

Second, as the discussion here should already have made
clear, plaintiffs need not compare their (mis)treatment to the
treatment accorded to Gay Games participants.  Instead they may

also challenge the purported justification for any difference in treatment as between themselves and other nonparticipants on the sidewalks outside the events.[4]

In short, the FAC survives under an Equal Protection theory as well. Again, however, the distinction between claims and theories of recovery (see, e.g., <u>NAACP v. Am. Fam. Mut. Ins. Co.</u>, 978 F.2d 287, 292 (7th Cir. 1992)) makes that unnecessary to the already-ruled rejection of Chicago's Rule 12(b)(6) motion.

Illinois Religious Freedom Restoration Act

Plaintiffs have also advanced a theory of recovery under the Illinois Religious Freedom Restoration Act ("Act," 775 ILCS 35/1 to 35/99). Act §35/15 provides:

> Government may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, unless it demonstrates that application of the burden to the person (i) is in furtherance of a compelling government interest and (ii) is the least restrictive means of furthering that compelling governmental interest.

On its own theory that all of plaintiffs' federal question contentions should be dismissed, Chicago contends that this Court should not exercise supplemental jurisdiction over that state law

---

[4]    Chicago's contention in its Reply, based on <u>Potts v. City of Lafayette</u>, 121 F.3d 1106, 1111 (7th Cir. 1997), that it may have a permissible content-neutral "secondary effect" type of justification for differentiating between individuals with contrary viewpoints on the streets is premature at this point. It may become an appropriate argument at a later time, if and when Chicago has brought forward evidence to support that justification.

issue under 28 U.S.C. §1367(c)(3).  Because those federally based

theories are not vulnerable to dismissal, however, this Court

will retain supplemental jurisdiction over plaintiffs' invocation

of the Act, based as it is on the same operative facts (see 28

U.S.C. §1367(a)).

As to the merits, Chicago contends that plaintiffs cannot

recover under the Act because they have not alleged a restriction

resulting from Chicago policy that could impose a substantial

burden on their exercise of religion.  In that respect one of the

few Illinois opinions to address the Act, <u>Diggs v. Snyder</u>, 333

Ill.App.3d 189, 195, 775 N.E.2d 40, 45 (5th Dist. 2002), has

held, quoting <u>Stefanow v. McFadden</u>, 103 F.3d 1466, 1471 (9th Cir.

1996):

> To constitute a showing of a substantial burden on
> religious practice, a plaintiff must demonstrate that
> the governmental action "prevents him from engaging in
> conduct or having a religious experience that his faith
> mandates."

Here Complaint ¶7 makes that very allegation.  It asserts

that as part of their "sincerely held religious belief,

Plaintiffs believe that they are obligated to tell as many other

people as they can about what they believe is their individual

need to be 'born again,'" and that tenet of their religion is

largely accomplished through engaging the public on sidewalks

with discussion and literature.  Chicago's policy at the Gay

Games of restricting plaintiffs' use of public sidewalks

20

prevented them from engaging in that practice, as they felt it was necessary to do (FAC ¶29).

Chicago cites Urban Believers, 342 F.3d at 761 to argue that those allegations show only that plaintiffs were inconvenienced, rather than substantially burdened, in their exercise of religion. That too is an argument for a later stage of the litigation, after plaintiffs have had an opportunity for factual development to support their claim (cf. Vineyard, 250 F.Supp.2d at 993, making that determination after a full bench trial). So that final aspect of Chicago's motion is rejected as well.

### Conclusion

Plaintiffs have sufficiently alleged a federal claim for relief under at least a First Amendment or Equal Protection Clause theory over which this Court has subject matter jurisdiction. Moreover, the FAC sets out an added theory of recovery under the Act, as to which this Court may exercise supplemental jurisdiction.

Although this opinion has not addressed the Free Exercise Clause and unlawful search and seizure theories that plaintiffs have also advanced against Chicago in Counts V and VIII, it is unnecessary to do so. After all, such cases as NAACP teach that so long as plaintiffs' allegations state a claim for relief under some theory, it is immaterial at the motion-to-dismiss stage to rule on whether they could or could not recover under all of the

potential theories presented on the same set of facts--and the parties' briefs really did not address those theories in any event.

As stated at the outset of this opinion, Chicago's motion to dismiss is denied in its entirety.  Chicago is ordered to answer the FAC on or before December 26, 2006, and this action is set for a status hearing at 9 a.m. January 22, 2007 to discuss further proceedings.

_____

Milton I. Shadur
Senior United States District Judge

Date:  December 14, 2006