# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| MICHAEL MARCAVAGE,  et al., | ) |  |
|  | ) | JUDGE: Milton I. Shadur |
| Plaintiffs, | ) |  |
|  | ) | MAG. JUDGE: Michael T. Mason |
| v. | ) |  |
|  | ) | No. 06 C 3858 |
| THE CITY OF CHICAGO, et al., | ) |  |
|  | ) | **TRIAL BY JURY DEMANDED** |
| Defendants, | ) |  |

---

## PLAINTIFFS' MEMORANDUM OF LAW IN
## SUPPORT OF THEIR RESPONSE TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................................................................................iii

INTRODUCTION....................................................................................................................1

ARGUMENT............................................................................................................................1

I.      SUMMARY OF FACTS...............................................................................................1

II.     PLAINTIFFS' FIRST AMENDMENT CLAIMS........................................................2

      A.    The Restrictions Were Not Content Neutral.................................................2

      B.    The Restrictions Were Not Narrowly Tailored.............................................6

      C.    The Restrictions Did Not Leave
           Ample Alternative Channels of Communication...........................................11

III.    PLAINTIFFS' EQUAL PROTECTION CLAIMS.......................................................12

IV.    PLAINTIFFS' FOURTH AMENDMENT CLAIMS....................................................14

      A.    Officer Andrews' Arrest of James Deferio...................................................14

      B.    Sergeant Teneyuque and Officer Madrigal's
           Arrest of Michael Marcavage.......................................................................16

V.     DEFENDANTS ARE NOT ENTITLED
      TO QUALIFIED IMMUNITY....................................................................................19

      A.    First Amendment and Equal Protection Claims............................................19

      B.    Fourth Amendment Claims............................................................................21

VI.    PLAINTIFFS' STATE LAW VIOLATIONS...............................................................23

      A.    Plaintiffs' RFRA Claims................................................................................23

      B.    Plaintiffs' Spoliation of Evidence Claim......................................................23

      C.    Plaintiffs' Conversion Claim.........................................................................24

      D.    Deputy Chief Dugan......................................................................................25

**VII.    DEFENDANTS ARE NOT IMMUNE
FROM PLAINTIFFS' STATE LAW CLAIMS**............................................................25

**CONCLUSION**............................................................................................................26

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

*Bay Area Peace Navy v. United States*, 914 F.2d 1224 (9th Cir. 1990) ........................................11

*Board of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987) .................................9, 19

*Brokaw v. Mercer County*, 235 F.3d 1000, 1022 (7th Cir. 2000)...................................................19

*Chicago Acorn v. MPEA*, 96 C 1997, 1999 U.S. Dist. LEXIS 9018 (N.D. Ill. June 2, 1999) ...........................................................................................................................................9, 19

*Chicago Acorn v. Metropolitan Pier and Exposition Authority*, 150 F.3d 695 (7th Cir. 1998) ...........................................................................................................................................9, 20

*City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984) ................................6

*City of Watseka v. Illinois Public Action Council*, 796 F.2d 1547 (7th Cir. 1986) ........................2

*Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984)...........................................2

*Cornelius v. NAACP Legal Defense & Education Fund*, 473 U.S. 788 (1985)............................11

*DeSalle v. Wright*, 969 F.2d 273 (7th Cir. 1992)...........................................................................20

*Diener v. Reed*, 232 F. Supp. 2d 362 (M.D. Pa. 2002) .............................................................8, 20

*Elrod v. Burns*, 427 U.S. 347 (1976) ..............................................................................................1

*Farrar v. Yamin*, 261 F. Supp. 2d 987, 995 (N.D. Ill. 2003) .......................................................23

*Frisby v. Schultz*, 487 U.S. 474 (1988)..................................................................................2, 6, 7

*Hague v. CIO*, 307 U.S. 496 (1939) ...............................................................................................2

*Humphrey v. Staszak*, 148 F.3d 719 (7th Cir. 1998).......................................................18, 21, 22

*International Society For Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992)...............8, 20

*Lee v. Sandberg*, 136 F.3d 94 (2d Cir. 1997)...............................................................................21

*Mustafa v. City of Chicago*, 442 F.3d 544 (7th Cir. 2006) ..........................................................18

*O'Hara v. O'Donnell*, 98 C 0979, 2001 U.S. Dist. LEXIS 12402 (N.D. Ill. 2001) ......................18

*Perry Ed. Association v. Perry Local Educators' Association*, 460 U.S. 37 (1983)..............2, 9, 19

*Plyler v. Doe*, 457 U.S. 202, 216 (1982)....................................................................................12

*Police Department of Chicago v. Mosley*, 408 U.S. 92 (1972) ...................................................13

*Saucier v. Katz*, 533 U.S. 194 (2001) .........................................................................................19

*Startzell v. City of Phildelphia*, 553 F.3d 183 (3d Cir. 2008) .....................................................10

*Stefanow v. McFadden*, 103 F.3d 1466 (9th Cir. 1996)...............................................................23

*United States v. Grace*, 461 U.S. 171 (1983)................................................................................2

*Virginia v. Black*, 538 U.S. 343 (2003)..................................................................................3, 10

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ............................................................2, 7, 10

*Weinberg v. City of Chicago*, 310 F.3d 1029 (7th Cir. 2002).....................................................11

*Wisconsin Action Coalition v. Kenosha*, 767 F.2d 1248 (7th Cir. 1985).....................................11

*Wash v. Village of Bellwood*, 00 C. 3240, 2001 U.S. Dist. LEXIS 14082 (U.S. Dist. N.D. Ill., Sept. 5 2001)...........................................................................................................................14

*World Wide St. Preachers' Fellowship v. Peterson*, 03 CV 1516, 2004 U.S. Dist. LEXIS 13961 (S.D. Ind. May 14, 2004) ...........................................................................................8, 20

## STATE CASES

*Cirrincione v. Johnson*, 703 N.E.2d 67, 184 Ill.2d 109 (Ill. 1998)............................................24

*Diggs v. Snyder*, 775 N.E.2d 40, 333 Ill. App. 3d 189 (Ill. App. Ct. 2002) ...............................23

*Harinek v. 161 N. Clark St. Ltd. Pshp.*, 692 N.E.2d 1177, 181 Ill.2d 335 (Ill. 1998) .................25

*People v. Weathington*, 411 N.E.2d 862, 82 Ill.2d 183 (Ill. 1980) .............................................17

## STATUTES

720 ILCS 5/21-3-A-2 ..................................................................................................................15

720 ILCS 5/26-1-A-1 ..................................................................................................................16

745 ILCS 10/1-101 *et seq* ............................................................................25

745 ILCS 10/1-210 ......................................................................................25

## INTRODUCTION

Defendants seek to characterize Plaintiffs' claims as a "few isolated incidents" and that Plaintiffs are "[i]gnoring the broad freedom they enjoyed in conducting [their] expressive activity." Defendants' Memorandum in Support of Motion for Summary Judgment 1 [Defs' Memo.] While Plaintiffs dispute this characterization, it is clear that a deprivation of First Amendment rights, even for a short period of time, constitutes irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976). Defendants, of course, deny that they violated Plaintiffs rights, and claim that their actions were "justified by their specific circumstances". Defs' Memo. 1. Defendants have not, and cannot, show undisputed material facts that entitle them to summary judgment as a matter of law.

Defendants assert that this lawsuit is driven by Michael "Marcavage's penchant for lawsuits, and not any unconstitutional actions by Defendants." Defs' Memo. 1-2. Defendants' only evidence of this fact is that Michael Marcavage has been "arrested or detained at least 18 times in the last ten years while traveling across the country to spread his message, and has turned those arrests into a cottage industry of sorts." Defs' Memo. 1. (Defendants added this to their statement of facts for no other reason than to use it for this purpose).[1] Plaintiffs object to the mentioning of Mr. Marcavage's arrests as immaterial, irrelevant and possibly prejudicial, as well as to Defendants' characterization of these arrests as "a cottage industry of sorts" for Michael Marcavage. It may be that Plaintiffs have been arrested numerous times. The same is true of Martin Luther King, Jr. and others exercising First Amendment rights. Defendants' comment insinuates that Mr. Marcavage's arrests are legitimate in order to give weight to their claim that the arrests and restrictions challenged in this case are legitimate. Defendants nonchalantly dismiss Plaintiffs' claims as the proclivity of Michael Marcavage for lawsuits in an attempt to devalue the seriousness of the claims Plaintiffs bring. The undisputed facts will not show Defendants' justifications to be true.

## ARGUMENT

## I. SUMMARY OF FACTS

Plaintiffs refer to their Response To Defendants' Local Rule 56.1(a)(3) Statement of Undisputed Material facts and Plaintiffs' Statement of Additional Facts, filed with this

---

[1] Defendants, predictably, fail to mention that of those 18 times that Michael Marcavage has been arrested or detained, he has never been convicted. Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts, 11 [Pls' SOF].

Memorandum, for their material facts. Plaintiffs' disagreements with Defendants' Statement of Facts are noted herein as well as in the Response.

## II. PLAINTIFFS' FIRST AMENDMENT CLAIMS

Defendants emphasize, throughout their motion for summary judgment, that Plaintiffs enjoyed "wide latitude to express their views at various public forums throughout the Gay Games." Defs' Memo. 2. However, this doesn't change the fact that individual Defendants violated Plaintiffs' rights by singling them out because of the content of their speech, forcing them to leave an open public forum while allowing similarly situated persons to stay, and arresting Plaintiffs without probable cause.

City streets and sidewalks have been, from time immemorial, places devoted to assembly and debate and therefore are traditional public fora. *United States v. Grace*, 461 U.S. 171, 179 (1983); *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45 (1983); *Hague v. CIO*, 307 U.S. 496, 515 (1939). No particularized inquiry into the precise nature of a specific street is necessary; all public streets are held in the public trust and are properly considered traditional public fora. *Frisby v. Schultz*, 487 U.S. 474, 481 (1988). In such places, government may enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. *Perry*, 460 U.S. at 45; see also *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

### A. The Restrictions Were Not Content Neutral

Defendant Dugan's restriction on Plaintiffs' ability to be on the sidewalk must be content neutral. *City of Watseka v. Illinois Public Action Council*, 796 F. 2d 1547, 1547 (7th Cir. 1986). Defendant's restriction on Plaintiffs was not content neutral. Government regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech. *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984). In this case Defendants have essentially admitted that the restrictions were not content neutral.

At Soldier Field, Plaintiffs, who sought to share the Gospel of Jesus Christ and their religious views regarding homosexual conduct, (Defs' SOF ¶ 9; Ans. SOF ¶ 14; Pls' SOF ¶ 1)[2], were not permitted to be on the paved sidewalk (Ans. SOF ¶ 18), while persons going to the Gay

---

[2] Defendants' Statement of Undisputed Material Facts will be referenced as "**Defs' SOF**". Plaintiffs' responses to Defendants' Statement of Undisputed Material Facts will be referenced as "**Ans. SOF**". Plaintiffs Statement of Additional Material Facts will be referenced as "**Pls' SOF**".

Games and with contrary views regarding homosexuality were not restricted by Dugan from being on the sidewalk, and were permitted to display their view in various ways, including through the use of signs, chants, and expressive clothing. Pls' SOF ¶ 2. In addition, Deputy Chief Dugan said that Plaintiffs could not stand stationary on the paved sidewalk, but that a man selling newspapers could be on the sidewalk standing stationary because that was "freedom of the press." Ans. SOF ¶ 25.

Defendants claim that at Soldier Field other groups of protestors who had messages similar to Plaintiffs' were treated the same as Plaintiffs. Even assuming this to be true, it does not show that the restrictions put on Plaintiffs were without reference to the content of their message, but, in fact, demonstrates the opposite and constitutes an admission that the restrictions were imposed based on the content of the speech. There were hundreds of persons on the sidewalks in the same vicinity of Plaintiffs that were not subject to the same restrictions as Plaintiffs. Pls' SOF ¶ 2. The only distinguishing feature between Plaintiffs, and others having the same message as Plaintiffs, and these persons were that the persons permitted on the sidewalk had a favorable view of homosexual conduct. Pls' SOF ¶ 2. The hallmark of the protection of free speech is to allow "free trade in ideas" – even ideas that may be unpopular, such as Plaintiffs speech, here, during the Gay Games. *Virginia v. Black*, 538 U.S. 343, 358 (2003).

There is no reasonable explanation as to why a man selling newspapers was allowed to remain stationary on the sidewalks, but Plaintiffs were not allowed on the sidewalks at all. The only explanation given by Deputy Chief Dugan at the time was that it was "freedom of the press." Ans. SOF ¶ 25. This explanation, far from exculpating the Defendants, demonstrates awareness on the part of the Defendants that persons have a right to use the sidewalks to exercise First Amendment rights. Further, in preventing Plaintiffs from exercising their First Amendment rights on the sidewalk, while allowing a newspaper salesman to sell newspapers on the sidewalk and supporters of the Gay Games to express their opinions on the sidewalk, Deputy Chief Dugan clearly distinguished Plaintiffs, and others with the same message, in applying the restriction *because* of the content of Plaintiffs' message.

At Gateway Park at Navy Pier, Officer Andrews prevented Plaintiffs from being in the Park at all. Defs' SOF ¶ 36. There is no evidence that the Navy Pier security guards told Officer Andrews to do this. Ans. SOF ¶¶ 34, 35. In fact, the Navy Pier security guards had been leading

Plaintiffs to Gateway Park. Ans. SOF ¶ 34. Nor is there any evidence that Navy Pier security told Officer Andrews that Plaintiffs were trespassing or that they needed a permit to be in Gateway Park. Ans. SOF ¶ 35. Gateway Park is a public forum in which Plaintiffs have a right to exercise their First Amendment rights. Pls' SOF ¶¶ 10, 11. There are thus no uncontested material facts to support any justification for Officer Andrews to completely prevent Plaintiffs from being in Gateway Park on July 16, 2006. Nor have Defendants demonstrated that Officer Andrews' restriction was content neutral. Thus, summary judgment with regard to this incident is inappropriate for this reason alone.

On July 22, 2006 at Wrigley Field, Defendants assert that all of the persons that Plaintiffs contend were treated more favorably than Michael Marcavage were distinguishable. Defendants claim that none of the people were in the same locations or causing the same disruptions as Marcavage. First, there are no uncontested material facts showing that Michael Marcavage was causing any disruptions. Those uncontested facts demonstrate that Plaintiff never blocked anyone at Wrigley Field, nor was he in the way of traffic when he was standing on the sidewalk by the northwest intersection of Addison and Sheffield. Ans. SOF ¶ 49. Similarly, Defendants claim that the persons Marcavage cites were not causing the same blockage or public safety concerns but without citing any uncontested facts showing that there was any blockage or public safety concern.

Defendants also claim that the man protesting President Bush was standing in a space north of the Sheffield Crosswalk (and not in the path of any pedestrians). Therefore, according to Defendants, the alleged differential treatment was driven by the different locations, not the content. But the facts don't support Defendants' claims. First, the location at which Michael Marcavage was standing when approached by Sergeant Teneyuque was not in the flow of traffic, nor was he at any point blocking traffic. Ans. SOF ¶ 49. Further, by comparing Michael Marcavage's position to the position of the man protesting President Bush, it is clear that Marcavage's position was no greater safety concern than that of the Bush protester. The Bush protester was in the area of the crosswalk separating the east and west sides of Sheffield Street on the north side of Addison. Ans. SOF ¶ 46. Defendants admit that Sheffield had been blocked off by Police barriers north of Addison (Defs' SOF ¶ 46), thus making the distance between the barriers and the edge of Addison street narrower than the sidewalk west of Sheffield on the north side of Addison. Michael Marcavage was standing on the sidewalk by the newspaper stand but

out of the flow of traffic.  Defs' SOF ¶ 50; Ans. SOF ¶ 50.  Thus his position relative to pedestrian traffic was identical to the man protesting President Bush.  If anything, Marcavage's position was less intrusive than the man protesting Bush because the sidewalk on which Marcavage was standing was extremely wide and the crosswalk on which the man protesting Bush was standing was narrower because of the barriers.  Ans. SOF ¶ 49.

Defendants claim that the man protesting Bush was treated similarly to Marcavage when he was in the same location as Marcavage.  Immediately after speaking with the Wrigley Field employee, Teneyuque said that "everybody" had to cross the street, but only Mr. Marcavage, whom Teneyuque was looking directly at, Mr. Murphy, and the man in the black hat were in the immediate vicinity.  Teneyuque's directive was not loud and he clearly was speaking directly at Mr. Marcavage and to no one else.  Ans. SOF ¶ 53.  Defendants claim that the man protesting Bush complied with Teneyuque's order, but he headed into the crosswalk to where his sign was, not across Addison Street.  Ans. SOF ¶ 53.  Defendants' facts admit that the man wearing the black hat "returned to his sign north of the crosswalk."  Defs' SOF ¶ 53.  Thus, the man in the black hat could not be said to have complied with the order. Coupled with the fact that no other person was asked to cross the street after Teneyuque said that "everyone" had to cross the street, the facts clearly show that Teneyuque was singling out Marcavage.

Halfway down the block, two people were distributing leaflets concerning a documentary.  Defs' SOF ¶ 42.  But the video also shows that the portion of the sidewalk where this person was handing out leaflets was the narrowest point on the entire sidewalk, and significantly narrower than where Marcavage was arrested.  Ans. SOF ¶¶ 42, 49.  No reasonable person could conclude that the area where Michael Marcavage was standing was more intrusive to pedestrian traffic than the area where the person handing out leaflets was standing.  The facts also show that there was at least one person standing still on the sidewalk waving a rainbow flag outside Gate D.  Ans. SOF ¶ 44.

Defendants also claim that other members of Plaintiffs' group were permitted to remain stationary and protest at the same corner just a few yards away from where Marcavage was arrested.  Def. Memo. 8-9.  Defendants then, falsely, claim that these other members of Plaintiffs' group were "away from the heavily trafficked areas."  Def. Memo. 9.  But again the facts do not bear this out.  Joe Christopherson used a step stool to preach in place while on the sidewalk right by where Mr. Marcavage was arrested.  Ans. SOF ¶ 63.  While preaching, the

sidewalk was significantly more crowded than when Mr. Marcavage was told to move across the street. Ans. SOF ¶ 63. Mr. Christopherson's location was substantially similar, and right next to, the location where Sergeant Teneyuque told Michael Marcavage to move across the street. Ans. SOF ¶ 63. Yet, Sergeant Teneyuque said nothing to Mr. Christopherson, though he was immediately in front of him. Ans. SOF ¶ 63. Defendants cite no facts showing that this location was any less intrusive (assuming it was intrusive at all) to pedestrian traffic. In fact, the video shows the opposite to be true. Mr. Marcavage and Mr. Christopherson were at no point blocking traffic. Ans. SOF ¶¶ 49, 63.

When Sergeant Teneyuque approached Michael Marcavage he initially told him to keep moving. Defs' SOF ¶ 51. But then Michael Marcavage was approached by a Wrigley Field employee who told Marcavage to cross the street. Defs' SOF ¶ 51. After the employee talked to Teneyuque, Sergeant Teneyuque told Marcavage to move across the street, and no longer told him he must keep moving. Ans. SOF ¶ 51. These facts are important because Defendants claim that the other persons who were engaged in free speech could be differentiated from Marcavage because either they were not standing still or they were not in the same exact location of Plaintiffs. Defs' Memo 8. However, Defendants' own facts show that these persons were not asked to cross the street despite the claim by Teneyuque that no one could stand on the sidewalk because it was Wrigley Field property and that "everyone" must cross the street. Defs' SOF ¶ 51; Ans. SOF ¶ 51. If Marcavage was required to move across the street, as Teneyuque and the Wrigley Field employee stated, then all other persons engaged in free speech activity should have been required to do so as well. However, by Defendants' own admissions, there were a number of people with various messages who were permitted to stay on the north sidewalk of Addison outside Wrigley Field, without being asked to cross the street. Ans. SOF ¶ 63. For this reason, Defendants' contentions differentiating Marcavage from others must fail and it is clear that the restrictions imposed on him were not content neutral.

To obtain summary judgment Defendants must demonstrated uncontested facts showing that the restrictions imposed were content neutral. Not only have they failed in this, but the facts clearly show that Plaintiffs were singled out because of their message.

## B. The Restrictions Were Not Narrowly Tailored

An order is narrowly tailored if it targets and eliminates no more than the exact source of the "evil" it seeks to remedy. *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (citing *City Council of*

*Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 808-10 (1984)).  A complete ban can be narrowly tailored, but only if each activity within the proscription's scope is an appropriately targeted evil.  *Frisby*, 487 U.S. at 485.  Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to further a legitimate governmental interest.  *Ward v. Rock against Racism*, 491 U.S. 781, 799 (1989).

Defendants' claim generally that the legitimate governmental interest sought to be advanced in this case was maintaining the free flow of pedestrian traffic.  Defs' Memo. 9.  Defendants also claim that Plaintiffs were generally allowed free access to parks, sidewalks, streets, and pathways throughout the week at the numerous events they attended, for as long as they desired, and were never forced to be in any specific, designated area.  Defs' Memo. 10.  But, even if true, the failure to interfere with Plaintiffs' rights on some occasions or in some ways does not prove that the restrictions imposed at Soldier Field, Navy Pier, and Gateway Park were narrowly tailored to serve the governmental interest of maintaining the free flow of pedestrian traffic.  Plaintiffs note that there is no evidence indicating that any individual police officer Defendants, who violated Plaintiffs' rights, were present at those times and places in which Defendants' claim that Plaintiffs' were free to exercise their rights.  *See* Defs' SOF 15.  A closer examination of the restrictions imposed by Defendants reveals that they were not narrowly tailored to serve Defendants' stated governmental interest.

At Soldier Field, the question is whether Defendants have demonstrated that there is no genuine issue as to any material fact and that, as a matter of law, Deputy Chief Dugan's order, forcing Plaintiffs to stand in the grassy or gravel area away from their intended audience, was narrowly tailored to promote Defendants' interest in maintaining the flow of pedestrian traffic.  On the contrary, the uncontested facts show that rather than merely preventing Plaintiffs from blocking pedestrian traffic on the sidewalk, Deputy Chief Dugan told Plaintiffs that they couldn't be on the sidewalk at all. Ans. SOF ¶ 18.  Dugan's command was more restrictive than required to prevent any blocking of pedestrian traffic.  Dugan's attempt at maintaining the flow of pedestrian traffic could have been just as easily achieved had Dugan allowed Plaintiffs access to the sidewalk while preventing Plaintiffs from blocking anyone.  See *Ward v. Rock against Racism*, 491 U.S. 798-99 (1989).  This is because the sidewalk on which Plaintiffs desired to be was a wide walkway which allowed many people to move freely at one time.  Pls' SOF ¶ 3.  The police officers on duty were there to monitor traffic flow and their job would be exactly the same

whether any person was violating either command.  Had Plaintiffs gone on the sidewalk in violation of Dugan's order, the police enforcement of that command (confronting Plaintiffs and either ordering them back off the sidewalk or arresting them) would have been exactly the same as if Plaintiffs had been blocking traffic while permitted to be on the sidewalk (confronting Plaintiffs and either ordering them to move or arresting them).

Further, the Defendants' justifications ring hollow because while preventing Plaintiffs from having access to the sidewalk, Dugan allowed access to the sidewalk to others.  For example, a man distributing newspapers was allowed access to the sidewalk.  Defs' SOF ¶ 25.  Also, persons supporting the message of the Gay Games were permitted access to the sidewalk.  Pls' SOF ¶ 2.  The trier of fact could easily conclude these others using the sidewalk were no less of a disruption to traffic than Plaintiffs.  Thus, the restrictions cannot be said to be narrowly tailored to further a legitimate government interest as a matter of law.

Plaintiffs sought access to the sidewalks in order to engage in one-on-one conversations and hand out tracts to passersby.  Pls' SOF ¶ 4.  Courts commonly recognize leafleting, or the offering of literature to those who might willingly accept the same, as one of the least intrusive methods of free expression.  *World Wide St. Preachers' Fellowship v. Peterson*, 03 CV 1516, 2004 U.S. Dist. LEXIS 13961, *38-39 (S.D. Ind. May 14, 2004) (citing *International Soc'y For Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992) (distinguishing leafletting in a public airport from direct solicitation), *Chicago Acorn v. Metro. Pier and Exposition Auth.*, 150 F.3d 695 (7th Cir. 1998) (holding that protection of leafleting was warranted in Navy Pier while other expressive activities were not), and *Diener v. Reed*, 232 F. Supp. 2d 362 (M.D. Pa. 2002) (holding that leafleting, unlike other expressive activities, was so minimally intrusive as not to interfere with designated purposes of museum grounds)).  Efforts to randomly distribute a leaflet, which can be accepted or refused, neither threaten public safety nor interfere with an individual's opportunity to walk down a sidewalk.  See *World Wide St. Preachers' Fellowship*, 2004 U.S. Dist. LEXIS 13961 at *38-39 (permitting the distribution of literature during a parade that was inconsistent with the parade's message).  Had Plaintiffs been allowed access to the paved sidewalk, they would have had access to their intended audience with their tried and true, and clearly protected, methods of evangelism.  But Deputy Chief Dugan's threat of arrest forced them to stand in the grassy or gravel area, off of the sidewalk, yards away from the intersection, where they could not leaflet to passersby.  Pls. SOF ¶ 5.

At Navy Pier, Officer Andrews completely prevented Plaintiffs from having any access whatsoever to Gateway Park. Defs' SOF ¶ 36. Gateway Park has wide sidewalks and a large grassy area conducive to a large number of people (Pls' SOF ¶ 8) and is a traditional public forum. Pls' SOF ¶ 10; see also *Chicago Acorn v. MPEA*, 96 C 1997, 1999 U.S. Dist. LEXIS 9018, *2, HN 1 (N.D. Ill. June 2, 1999). In a traditional public forum, the government may not prohibit all communicative activity. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). Regardless of whether the venue is a public forum or a nonpublic forum, no conceivable governmental interest can justify such an absolute prohibition of speech. *Board of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 575 (1987). Here there is no dispute that Officer Andrews completely prevented Plaintiffs from engaging in First Amendment activity in Gateway Park. Whatever the governmental interest asserted by Officer Andrews, because *all* access to the park was denied, Defendants cannot show, as a matter of law, that ample alternative channels of communication were left open and that this total barring of Plaintiffs from a traditional public forum is narrowly tailored to serve the governmental interest in securing the free flow of pedestrian traffic.

At Wrigley Field, Michael Marcavage was first told by Sergeant Teneyuque that he must "keep moving". Defs' SOF ¶ 51. However, immediately after talking to a Wrigley Field employee, Sergeant Teneyuque changed his command and now told Marcavage that he must cross the street. Ans. SOF ¶ 53. According to Defendants' facts, which are contested by Plaintiffs, it was only after Marcavage disobeyed this second command that Sergeant Teneyuque arrested Marcavage. Defs' SOF ¶¶ 56-57. The facts also suggest that Marcavage was the only one who was asked either to go across the street or to keep moving. Defs' SOF ¶¶ 50, 51; Ans. SOF ¶ 51, 53. Thus, the question to be answered is whether Teneyuque's command that Marcavage must cross the street was narrowly tailored to achieve the governmental interest of maintaining the orderly flow of traffic.

Defendants do not even argue that forcing Marcavage to cross the street was, as a matter of law, narrowly tailored to serve the governmental interest of preventing the blocking of pedestrian traffic. Instead, Defendants focus on the initial command of Teneyuque for Marcavage to keep moving. However, it is undisputed that once Teneyuque spoke with the Wrigley Field employee, he abandoned his original command and replaced it with the new command that Marcavage must cross the street. Ans. SOF ¶ 51. It was only after the failure of

Marcavage to meet this command that he was arrested. Defs' SOF ¶ 57; Ans. SOF ¶ 57. The complete ban on access to the sidewalk on the north side of Addison was clearly not narrowly tailored. The fact that Teneyuque himself changed the command amounts to an admission by Teneyuque that a narrower command would have served Defendants' legitimate governmental interest. See *Ward v. Rock Against Racism*, 491 U.S. 798-99 (1989).

Furthermore the facts demonstrate that even Teneyuque's original command to "keep moving" was not narrowly tailored. As noted above (pp. 4-6), other persons exercising their First Amendment rights were permitted to remain stationary on the sidewalk, which shows that Teneyuque did not believe that all stationary exercise of First Amendment rights interfered with the free flow of traffic pedestrian traffic. Absent undisputed evidence, which does not exist, showing Marcavage was blocking pedestrians while others were not, Defendants cannot prevail on their summary judgment claim. Ans. SOF ¶ 49.

Defendants cite *Startzell v. City of Philadelphia*, 553 F.3d 183 (3d Cir. 2008) to support their claim that the restrictions fashioned by the police in this case were narrowly tailored. The court in that case determined that the police had ample justification to direct Repent America (RA) to move when it interfered with the permitted events by expressing their message with loud bullhorns right next to the main stage where musical performances were being held, directly confronting a transgendered individual with allegedly insulting speech, and blocking access to the vendors who had applied for booths. Because RA was interfering with the permitted event's message, something other attendees were not doing, the court determined that the police officers, in that case, were justified in directing RA away from the stage and the vendors, and that this direction was narrowly tailored to further a legitimate governmental interest. *Id*. at 199, 202. This case isn't even remotely on point since there is no evidence in this case that Plaintiffs were interfering with any event's message, engaging in any allegedly insulting speech,[3] or blocking access to anyone. Police, in *Startzell*, moved Plaintiffs to a different location and according to the court, this action was narrowly tailored because of Plaintiffs interference, insulting language, and blocking. Whatever the merits of *Startzell*, it has nothing to do with this case other than it involves the same organization to which Plaintiffs belong.

---

[3] While Plaintiffs' speech may have been unpopular in the context of the Gay Games, that, in and of itself, does not make it insulting or a legitimate reason to distinguish between Plaintiffs and other persons. See *Virginia v. Black*, 538 U.S. 343, 358 (2003).

As demonstrated above, Defendants have not shown that, based on undisputed facts, as a matter of law, Defendants' restrictions on Plaintiffs' free speech and free exercise rights were narrowly tailored, and for that reason alone, their motion must fail.

**C. The Restrictions Did Not Leave Ample Alternative Channels of Communication**

Defendants cite *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 809 (1985) for the proposition that an adequate alternative doesn't have to be the speaker's first or best choice, or even one that provides the same audience or impact. But that case dealt with speech in a nonpublic forum and is inapplicable here.

Where public fora are considered, the mere existence of alternative methods of expression is not sufficient; the government must also show that the alternatives to the prohibited methods of expression are ample and adequate. *Wisconsin Action Coalition v. Kenosha*, 767 F.2d 1248, 1256 (7th Cir. 1985). Whether an alternative is ample should be considered from the speaker's point of view. *Weinberg v. City of Chicago*, 310 F.3d 1029, 1041 (7th Cir. 2002). An alternative is not adequate if it forecloses a speaker's ability to reach one audience even if it allows the speaker to reach other groups. Id. The 7th Circuit has cited *Bay Area Peace Navy v. United States*, 914 F.2d 1224 (9th Cir. 1990), favorably for the proposition that "an alternative is not ample if the speaker is not permitted to reach the intended audience." *Weinberg*, 310 F.3d at 1042 (citing *Bay Area Peace Navy*, 914 F.2d at 1229).

Defendants claim that because Plaintiffs had alternative fora to express their message throughout the Gay Games Defendants are entitled to summary judgment as a matter of law. But the question is not whether a restriction put on Plaintiffs in a specific location left Plaintiffs other alternatives to engage in free speech, rather it is whether Plaintiffs had opportunities throughout the week to reach their intended audience. The alternative fora do not meet that constitutional standard.

Defendants state that Plaintiffs were able to stand in the gravel/dirt space outside of Soldier Field where they were able to express their views by holding signs and shouting. Defs' SOF ¶ 19. However, Plaintiffs' intended audience were the homosexuals and other participants in the Gay Games Opening Ceremonies. Because Plaintiffs were not allowed on the paved sidewalk near or before the intersection where Gay Games participants were walking, Plaintiffs were completely unable to reach their intended audience with one-on-one conversations or Gospel tracts. Pls' SOF ¶ 4.

A major part of Plaintiffs' ministry involves one-on-one presentation of the Gospel of Jesus. This requires no less than one to two minutes of continuous conversation with a member of the public. Plaintiffs also must be within arms length of the flow of traffic in order to hand out tracts. Ans. SOF ¶ 19. Had Plaintiffs been allowed access to the paved sidewalk, they would have had access to their intended audience with their tried and true methods of evangelism. But Deputy Chief Dugan's threat of arrest forced them to stand in the grassy or gravel area, off of the sidewalk, yards away from the intersection. Worse still, their audience was reduced to a very few people, most of whom appeared to be families exiting a nearby museum; and who appeared not to be homosexuals or Gay Games participants. Pls' SOF ¶ 5. Plaintiffs could not reach their intended audience from the grassy or gravel area by merely shouting and holding signs, while being prevented from handing out tracts and engaging in one-on-one conversations. Pls' SOF ¶ 4.

As for Gateway Park, Defendants claim that Plaintiffs were given ample alternative channels because they were "allowed to protest in any areas not controlled by MPEA's permit requirements." Defs' Memo. 12. But Officer Andrews completely prevented Plaintiffs from access to Gateway Park, a traditional public forum. Pls' SOF ¶¶ 9, 10. This complete prohibition gave Plaintiffs no alternative channel to engage in free speech activity.

At Wrigley Field, like Soldier Field, the question is whether Michael Marcavage had ample alternative channels to reach his intended audience from across the street. Sergeant Teneyuque required Marcavage to go across the street, and arrested him when he did not, preventing him from engaging in one-on-one conversations and handing out tracts to those persons attending or supporting the Gay Games. Ans. SOF ¶¶ 51, 53, 54. Being required to shout from across the street prevented him from communicating with his intended audience because they would not be able to hear him. Ans. SOF ¶ 54. Further, merely allowing Marcavage the ability to hold signs from across the street, while being prevented from handing out tracts, would not allow him to effectively reach his intended audience. Ans. SOF ¶ 54.

Defendants have not demonstrated, as a matter of law, that Plaintiffs were provided adequate alternative fora for their protected free speech and free exercise rights.

### III. PLAINTIFFS' EQUAL PROTECTION CLAIMS

The equal protection clause requires that all persons similarly situated should be treated alike. *Plyler v. Doe*, 457 U.S. 202, 216 (1982). As Defendants point out, when the state treats

persons engaged in First Amendment activity differently from other persons, it subjects itself to heightened scrutiny, including the time, place and manner test. Defs' Memo 13, n. 8 (citing *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 101 (1972)). Therefore, as explained in Section II, above, and for the same reasons, Defendants cannot show, as a matter of law, that their actions were permissible time, place and manner restrictions, and therefore cannot succeed in their motion for summary judgment on Plaintiffs' equal protection claims. Indeed, the facts show that Plaintiffs were treated differently from similarly situated persons who were also engaged in First Amendment activity. Thus even if the treatment of Plaintiffs should be compared, for equal protection purposes, to others exercising First Amendment rights rather than to the treatment of the general public, summary judgment would still not be appropriate.

Defendants claim that at Soldier Field all protestors engaging in expressive activity were subjected to the same requirement to demonstrate in the gravel area at the intersection of the sidewalks if they wanted to remain stationary at that location. Defs' Memo 13-14. At Soldier Field, Plaintiffs, who sought to exercise their rights of free expression and free exercise, (Defs' SOF ¶ 9; Ans. SOF ¶ 14; Pls' SOF ¶ 1), were not permitted to be on the paved sidewalk (Ans. SOF ¶ 18), while other persons were permitted to express the view that homosexuality is not a sin and should be embraced on the paved sidewalk and in various ways, including signs, chants, and expressive clothing. Pls' SOF ¶ 2. Thus, while Plaintiffs were completely prevented from accessing the sidewalk for any protected activity, including handing out gospel tracts, pro-homosexual supporters were permitted to engage in many kinds of First Amendment activity on the very same sidewalk.

Officer Andrews completely prevented Plaintiffs from engaging in free speech activity at Gateway Park. Defendants argue that there is no evidence that any other person or group was allowed to demonstrate in Gateway Park without a permit. But the facts show that groups historically have been allowed to engage in First Amendment activity in Gateway Park without a permit. Pls' SOF ¶ 11. Defendants can show no reason why Plaintiffs were completely barred from engaging in free speech activity at Gateway Park while others have been permitted to do so.

Defendants argue that at Wrigley Field Marcavage cannot show that the people distributing literature, the people waving rainbow flags and the man protesting President Bush were similarly situated because they were not standing in front of a busy crosswalk, like Marcavage. However, as explained above, there is no evidence that Marcavage was standing in

front of the crosswalk, let alone blocking anyone.  Ans. SOF ¶ 49.  Further, as explained above, the man protesting Bush was *in the crosswalk* and the person distributing literature was standing on the narrowest portion of the sidewalk.  Ans. SOF ¶¶ 42, 46.  Defendants claim that these persons were dissimilar to Marcavage because they didn't resist any orders to keep walking. However, as explained above, the man protesting Bush did not comply because rather than cross the street, he went into the crosswalk.  Ans. SOF ¶ 53.

Defendants have clearly not met the standard for summary judgment on Plaintiffs' Equal Protection claims even if, as Defendants contend, Plaintiffs' treatment should be compared only with the treatment of others engaged in First Amendment activity.

## IV. PLAINTIFFS' FOURTH AMENDMENT CLAIMS

The arrests of Jim Deferio and Michael Marcavage violated the Fourth Amendment because probable cause did not exist for an officer to believe that both Plaintiffs had committed a crime.

In Fourth Amendment terms any arrest is deemed reasonable so long as the police are doing no more than they are legally permitted and objectively authorized to do.  This inquiry is framed in terms of two objective factors: First did the arresting officer have probable cause to believe that the defendant had committed or was committing an offense.  Second, was the arresting officer authorized by state and/or municipal law to effect a custodial arrest for the particular offense.  *Wash v. Village of Bellwood*, 00 C. 3240, 2001 U.S. Dist. LEXIS 14082, *15 (U.S. Dist. N.D. Ill., Sept. 5 2001).

Probable cause to arrest exists for a law enforcement officer when the facts and circumstances within his knowledge and of which he has reasonable trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed or was committing an offense.  *Id.* at *16.

### A. Officer Andrews' Arrest of James Deferio

James Deferio was charged with trespassing at Navy Pier.  Pls' SOF ¶ 15.  Officer Andrews was the arresting officer for the arrest of Deferio and completed the arrest report and case report, but not the complaint.  Pls' SOF ¶¶ 14, 16.

Despite not seeing him sign the complaint, Officer Andrews testified that Michael Pritchett, a Navy Pier security guard, signed complaints for trespassing against Mr. Deferio and Mr. Murphy.  Pls' SOF ¶ 17.  Michael Pritchett never signed a complaint against Mr. Deferio nor

did he agree to sign any complaint. Pls' SOF ¶¶ 21, 22. No Navy Pier security personnel told Officer Andrews to have any Plaintiff arrested for trespassing or for any other reason. Pls' SOF ¶ 18. At the station, Watch Commander Schmidt told Officer Andrews that Navy Pier personnel did not want to have Mr. Murphy or Mr. Deferio arrested. Pls' SOF ¶ 19. Watch Commander Schmidt told Officer Andrews that Navy Pier personnel did not want to sign any complaints. Pls' SOF ¶ 19.

Officer Fierro, a Chicago police officer who helped Andrews with the paperwork but was not involved in the decision to arrest any Plaintiffs, did not obtain permission from Pritchett to sign Pritchett's name to any complaint, nor did he speak with any of the Navy Pier security officers. Pls' SOF ¶ 23. Officer Andrews told Officer Fierro that Mr. Pritchett had given Officer Andrews permission to sign Mr. Pritchett's name to the complaints against Mr. Deferio and Mr. Murphy. Pls' SOF ¶ 24. Officer Fierro does not remember signing Mr. Pritchett's name. Pls' SOF ¶ 25.

Mr. Deferio was charged with criminal trespass to land. According to the complaint, Mr. Deferio "knowingly and intentionally remained upon the land of Navy Pier located at 600 West Grand in Chicago IL of Cook County after receiving noticed [sic] from the security officer to leave the Navy Pier" in violation of 720 ILCS 5/21-3-A-2. SOF ¶ 15. That section states "whoever...enters upon the land of another, after receiving, prior to such entry, notice from the owner or occupant that such entry is forbidden...commits a Class B misdemeanor." 720 ILCS 5/21-3-A-2.

Officer Andrews had no reasonable information to warrant a prudent person in believing that Mr. Deferio had committed criminal trespass since *no Navy Pier security officer* told Officer Andrews that they sought Mr. Deferio's arrest for trespassing or any other reason. Pls' SOF ¶¶ 18, 26, 27. The MPEA security officers told Plaintiffs they could engage in free speech activity in Gateway Park. The Plaintiffs went where the MPEA security officers told them to go: Gateway Park. Pls' SOF ¶ 12. Therefore, there is no basis on which Officer Andrews could believe that the Plaintiffs were on entering on land where they had received notice that it was forbidden. As a matter of practice, the MPEA does not require a permit for persons wishing to engage in free speech activity in Gateway Park. Pls' SOF ¶ 11. So there are no facts that show that Officer Andrews could have believed that Plaintiffs were in Gateway Park after being asked to leave.

Additionally, Michael Pritchett never signed a complaint against Mr. Deferio and Mr. Murphy nor did he agree to sign any complaint. Pls' SOF ¶¶ 21, 22. With no complaint by any Navy Pier security personnel against Mr. Deferio for trespass, Officer Andrews had no basis to arrest Mr. Deferio and charge him with trespass. Despite having no complaint from any Navy Pier security personnel, Officer Andrews improperly went ahead with the arrest of James Deferio. There is also evidence that Officer Andrews knew he had no basis for arresting Plaintiffs in that he fabricated a basis for the arrest by testifying, contrary to the testimony of the MPEA representatives, that MPEA had requested the arrests.

**B. Sergeant Teneyuque and Officer Madrigal's Arrest of Michael Marcavage**

Plaintiff Marcavage was charged with disorderly conduct, though Sergeant Teneyuque admitted he did not know which statute he would charge Marcavage with at the point of arrest. Pls' SOF ¶¶ 30, 33. As a basis for probable cause for Marcavage's arrest, Officer Madrigal claims that a man named Phil Johnson complained to him about Mr. Marcavage allegedly "blocking" him from entering the sidewalk. Pls' SOF ¶ 34. But the claim that Mr. Marcavage engaged in criminal activity is spurious and should be rejected based on Defendants' own admissions.

Sergeant Teneyuque and Officer Madrigal admit that the only reason they arrested Mr. Marcavage was that he "blocked" Mr. Johnson. Pls' SOF ¶ 34. But they both admit that Mr. Marcavage was only in the vicinity of Johnson for "five to seven seconds." Pls' SOF ¶ 34. They both admit that there was no physical contact whatever between Marcavage and Johnson. Pls' SOF ¶ 34. Defendants both admit they observed no actions by either Johnson or Marcavage that suggested a possibility of physical contact. Pls' SOF ¶ 34. Neither officer overheard any conversations between Marcavage and Johnson and was not told any conversation that occurred between them. Pls' SOF ¶ 34. Officer Madrigal admits that he spoke with Phil Johnson (but could not recall the words of the conversation) for less than one minute before deciding to arrest Michael Marcavage and didn't speak to Mr. Johnson again. Pls' SOF ¶ 35. Sergeant Teneyuque admits that he never spoke with Mr. Johnson at all. Pls' SOF ¶ 35. Still they charged Michael Marcavage was disorderly conduct.

A "person commits disorderly conduct when he knowingly...[d]oes any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace." 720 ILCS 5/26-1-A-1.

A trier of fact could easily conclude that standing in front of someone while one is in conversation with another for several seconds is not unreasonable. There is no evidence whatever that Mr. Marcavage said anything unreasonable, or that Marcavage said anything to alarm or disturb Mr. Johnson.

Both Defendants admitted that Mr. Marcavage did not use any fighting words and that no physical contact occurred. Pls' SOF ¶ 34. The mere conversation between Mr. Marcavage and Mr. Johnson is not enough to amount to a breach of the peace.

Defendants claim that Marcavage's conduct could reasonably be shown to be disorderly conduct in several ways. First, they claim that Marcavage interfered with the public safety interest in maintaining the orderly movement of pedestrians in a crowded and heavily trafficked area during a major event. Defs' Memo 19. However, the facts show that Marcavage was not blocking anyone and that his conduct was not materially different from any other person on the sidewalk outside of Wrigley Field that day. Ans. SOF QQ 49, 50. Teneyuque could not reasonably have believed that Marcavage was in a position to block anyone since he had been standing in a similar location earlier and because other similarly situated persons were not told to leave because they were blocking. Ans. SOF ¶¶ 42, 44, 47, 49-51, 53, 63; Defs' SOG ¶¶ 46, 47, 60-63.

Defendants next contend that Marcavage's refusal to heed a lawful order from Teneyuque to keep moving or cross the street supports probable cause. Defs' Memo. 20. But as Defendants admit, Illinois law requires that the refusal to obey the order extend beyond mere argument with the police and encompass a physical act of resistance. *People v. Weathington*, 411 N.E.2d 862, 863, 82 Ill. 2d 183, 186 (Ill. 1980). Here, that requirement is not met. First, when Teneyuque initially told Marcavage to cross the street, Marcavage began to argue with Teneyuque, but eventually crossed the street. Defs' SOF ¶¶ 50-53; 55. Marcavage never extended beyond argument with the police because before he was arrested, he was chest-bumped and shoved by Officer Teneyuque and thus was pushed to the ground. Ans. SOF ¶ 57. Thus, there was no physical refusal by Marcavage to obey a lawful order. Additionally, as explained above, Teneyuque's orders were in violation of the First and Fourteenth Amendments, and therefore were not lawful.

Third, Defendants argue that Marcavage's arguing with Teneyuque's orders supports probable cause. Defendants claim that Marcavage's arguing affected public safety because it

hindered Teneyuque's ability to attend and manage the area. Defs' Memo 21. Defendants cite several cases for this proposition, but the facts in these cases are markedly different from the case at hand. First, in *O'Hara v. O'Donnell*, 98 C 0979, 2001 U.S. Dist. LEXIS 12402 (N.D. Ill. 2001), O'Hara walked into the street and was blocked by and told to go back on the sidewalk by O'Donnell who was directing pedestrian and vehicular traffic. O'Hara began arguing loudly, which attracted a crowd, causing a disruption in pedestrian traffic. *Id*. at *4-5.

In *Humphrey v. Staszak*, 148 F.3d 719 (7th Cir. 1998), Humphrey witnessed the pursuit and arrest of an African-American man by four white officers. *Id*. at 721. As the officers began to escort the arrested man back towards the subway entrance, Humphrey approached them and demanded to know why they were arresting the man who was a stranger to Humphrey. *Id*. Humphrey began shouting at the officers, asking for their names and badge numbers. *Id*. Humphrey continued with the exchange and followed them to the subway entrance. *Id*. Humphrey blocked them at the subway entrance where passersby began to gather to watch the altercation between Humphrey and the officers. *Id*. The officers warned Humphrey that if he did not leave he would be arrested for disorderly conduct. *Id*.

In *Mustafa v. City of Chicago*, 442 F.3d 544 (7th Cir. 2006), On December 28, 2001, just three months after the attacks of September 11, Mustafa was traveling in an airport and had her luggage sent to a bomb-detection machine. *Id*. at 547. She believed she was being racially profiled, and then stated "Maybe I have a bomb in my purse." *Id*.

In contrast to these cases, there is no evidence whatsoever that Marcavage's discussion with Sergeant Teneyuque had any tendency to create a public disorder. Further, there is absolutely no evidence whatsoever that Marcavage's argument with Teneyuque was even noticed by more than a few people, let alone caused any disturbance or led to a situation that threatened the safety of the public. Ans. SOF ¶¶ 49, 50. There is also a conflict in testimony between Officer Madrigal and Sergeant Teneyuque and Marcavage, in that Defendants' basis for the arrest was that Marcavage had a confrontation with a man named Phil Johnson, while Plaintiffs deny any confrontation with Johnson. While the conflict in testimony is enough to defeat summary judgment, it also may be indicative of the fact that Defendants knew that the basis for arresting Marcavage was not enough, causing them to construct the Johnson incident.

Therefore, Defendants cannot prevail on their summary judgment motion on the issue of Fourth Amendment violations because they cannot show undisputed material facts

demonstrating, as a matter of law, that Defendants had a probable cause to arrested James Deferio or Michael Marcavage.

## V. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

Defendants assert that they are entitled to qualified immunity. To avoid the defense of qualified immunity Plaintiffs must pass a two-part test. First, Defendants must have violated Plaintiffs' constitutional rights. Second, those rights must have been clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Here, as demonstrated above, Defendants have violated Plaintiffs' constitutional rights. Therefore, the only inquiry for the Court is the whether Plaintiffs' constitutional rights were clearly established. In the second inquiry "binding precedent is not necessary to clearly establish a right." *Brokaw v. Mercer County*, 235 F.3d 1000, 1022 (7th Cir. 2000). Rather than having to point to a closely analogous case, a plaintiff need only show that the violation was so obvious that a reasonable person would have known of its unconstitutionality. *Id.* As will be demonstrated below, the rights violated by Defendants are bouth clearly established by precedent and obvious to any reasonable person.

## A. First Amendment and Equal Protection Claims

Defendants claim that Plaintiffs can point to no preexisting case law dictating that Defendants' time, place, and manner restrictions violated Plaintiffs rights. Defendants argue that it was reasonable for Officer Andrews to prevent Plaintiffs from accessing Gateway Park because no courts have ruled on the issue before. However, Defendants are mistaken. Gateway Park is a traditional public forum in which free speech activity, such as speaking with members of the public, preaching, handing out tracts, and holding signs and banners, are permitted. *Chicago Acorn v. MPEA*, 96 C 1997, 1999 U.S. Dist. LEXIS 9018, *2, HN 1 (N.D. Ill. June 2, 1999); Pls' SOF 13. In a traditional public forum, the government may not prohibit all communicative activity. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). Regardless of whether the venue is a public forum or a nonpublic forum, no conceivable governmental interest can justify such an absolute prohibition of speech. *Board of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 575 (1987). Thus, case law clearly establishes that free speech activity is allowed in Gateway Park and no reasonable person could think otherwise.

At Soldier Field, Deputy Chief Dugan forced Plaintiffs to stay off the paved sidewalk where Gay Games participants and spectators were walking towards Soldier Field, and forced

them to stand in the grass and gravel portion of the sidewalk which was many yards east of the intersection of the McFetridge sidewalk and the sidewalk going south to the east side of Soldier Field. Ans. SOF ¶ 18.  Courts commonly recognize leafleting, or the offering of literature to those who might willingly accept the same, as one of the least intrusive methods of free expression.  *World Wide St. Preachers' Fellowship v. Peterson*, 03 CV 1516, 2004 U.S. Dist. LEXIS 13961, *38-39 (S.D. Ind. May 14, 2004) (citing *International Soc'y For Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992) (distinguishing leafletting in a public airport from direct solicitation), *Chicago Acorn v. Metro. Pier and Exposition Auth.*, 150 F.3d 695 (7th Cir. 1998) (holding that protection of leafleting was warranted in Navy Pier while other expressive activities were not), and *Diener v. Reed*, 232 F. Supp. 2d 362 (M.D. Pa. 2002) (holding that leafleting, unlike other expressive activities, was so minimally intrusive as not to interfere with designated purposes of museum grounds)).  Efforts to randomly distribute a leaflet, which can be accepted or refused, neither threaten public safety nor interfere with an individual's opportunity to walk down a sidewalk.  See *World Wide St. Preachers' Fellowship*, 2004 U.S. Dist. LEXIS 13961 at *38-39 (permitting the distribution of literature during a parade that was inconsistent with the parade's message).  Dugan completely prevented Plaintiffs from accessing the sidewalks in order to distribute their gospel tracts.  Case law clearly shows that doing so is a violation of Plaintiffs' free speech rights, and therefore Plaintiffs rights were clearly established and Dugan cannot claim qualified immunity.

As for the violations of Marcavage's rights at Wrigley Field, the issue is whether Teneyuque's treatment of Marcavage violated his First and Fourteenth Amendment rights, and whether Teneyuque's arrest and order of Marcavage to move across the street was lawful because Teneyuque singled Marcavage out and did not instruct similarly situated individuals to do the same.  Defendants admit that if Teneyuque treated Marcavage differently than other similarly situated persons, he was in violation of the equal protection clause.  Defs' Memo. 13; *DeSalle v. Wright*, 969 F.2d 273, 275 (7th Cir. 1992).  Thus the right itself is clearly established. Defendants argue only that, as a matter of fact, which is contested, Teneyuque did not treat Marcavage differently from other similarly situated persons.  Marcavage possessed a clearly established right, that even Defendants acknowledge. A trier of fact could easily find that a reasonable person could not have believed that there was no such right.

Thus, Defendants should not be granted summary judgment on the issue of qualified immunity on the equal protection and First Amendment claims.

**B. Fourth Amendment Claims**

Defendants are likewise not entitled to qualified immunity with regard to Plaintiffs' Fourth Amendment claims. As stated above, a party is entitled to summary judgment on qualified immunity grounds only if the court finds that the rights asserted by the plaintiff were not clearly established, and that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right. See *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998) (citing *Lee v. Sandberg*, 136 F.3d 94, 102 (2d Cir. 1997)).

Defendants assert that Officer Andrews is entitled to qualified immunity with respect to the arrest of Deferio because he could have reasonably believed probable cause existed to arrest Deferio for criminal trespass by refusing to leave Gateway Park and by violating the MPEA Policy. Defs' Memo. 24. First, Defendants cite no evidence that Officer Andrews knew MPEA's policy. As Defendants note, Officer Andrews had only been working at Navy Pier a few days. Defs' SOF ¶ 34. No Navy Pier security guard said they talked to Andrews (Ans. SOF ¶ 34) so Officer Andrews had no way to learn what MPEA's policy was. As a matter of practice, the MPEA does not require a permit for persons wishing to engage in free speech activity in Gateway Park. Various groups have been permitted to engage in free speech activity in Gateway Park without a permit, including Jews for Jesus, PETA, and a group protesting army recruiting for the Iraq war. Pls' SOF ¶ 11.

Officer Andrews could not have reasonably believed that Deferio was trespassing because as explained above, and contrary to Officer Andrews' own "sworn testimony" no Navy Pier security guard made a complaint against Deferio for trespass, nor did they claim that Plaintiffs could not engage in free speech activity at Gateway Park. Pls' SOF ¶ 18. Navy Pier security were escorting Plaintiffs into Gateway Park and Andrews could not have reasonably believed that Plaintiffs were not allowed in Gateway Park, despite being escorted there by security. Ans. SOF ¶ 35. Therefore, no reasonable person in Andrews' position could believe that Deferio had committed trespass.

Defendants assert that Plaintiffs' claim against Teneyuque and Madrigal for Fourth Amendment violations can only survive if it was clear at the time of Marcavage's arrest that a demonstrator standing still on the sidewalk in a crowded plaza and next to two crosswalks, and refusing repeated orders to keep moving or to cross the street, could not provide probable cause to arrest the person for disorderly conduct. Defs' Memo. 25. Defendants again cite to cases that Plaintiffs have shown involve situations clearly distinguishable from this one. Defs' Memo. 25. As shown above, the facts show that Marcavage was not blocking anyone and was not causing or likely to cause any disturbance. Ans. SOF ¶ 49. Further, though Marcavage was standing still, the evidence shows that many other people were also standing still on the sidewalk, and that Teneyuque did not ask them to move. Ans. SOF ¶ 47. Further, as shown above, Marcavage complied with Teneyuque's order initially, and did not do anything to physically resist Teneyuque's order while in discussion with him, but was arrested when Teneyuque pushed him to the ground. Ans. SOF ¶¶ 56, 57. A reasonable trier of fact could conclude that no reasonable person would believe the arrest proper.

Defendants cite *Humphrey v. Staszak*, 148 F.3d 719, 727 (7th Cir. 1998) for the proposition that "in the context of an arrest for disorderly conduct, the doctrine of qualified immunity should provide broad protection from suit where the facts show that in addition to loud argument, such factors as time, place, circumstances, and conduct other than arguing, support probable cause." The facts don't show that loud argument existed in this case. Further, while it is true that factors such as time, place, circumstances, and conduct can be used to support probable cause, Defendants cite no factors that show that Teneyuque could have believed that the situation required the arrest of Marcavage. There is no evidence whatsoever that Marcavage's discussion with Sergeant Teneyuque had any tendency to create a public disorder. There is absolutely no evidence whatsoever that Marcavage's argument with Teneyuque was even noticed by more than a few people, let alone caused any disturbance or led to a situation that threatened the safety of the public. Ans. SOF ¶¶ 49, 50.

Therefore, Defendants cannot show that they are entitled to qualified immunity on the Fourth Amendment claims.

## VI. PLAINTIFFS' STATE LAW VIOLATIONS

### A. Plaintiffs' RFRA Claims

To constitute a showing of a substantial burden on religious practice, a plaintiff must demonstrate that the governmental action "prevents him from engaging in conduct or having a religious experience that his faith mandates." *Diggs v. Snyder*, 775 N.E.2d 40, 45, 333 Ill. App. 3d 189, 195 (Ill. App. Ct. 2002) (quoting *Stefanow v. McFadden*, 103 F.3d 1466, 1471 (9th Cir. 1996)).

According to Defendants, because Plaintiffs were barred from exercising their religion on only three occasions in an entire week, this amounts to a mere inconvenience as a matter of law. One wonders how many times Plaintiffs must be barred from practicing their religion in a week to constitute a "substantial burden" under Defendants' view. There is no requirement that Defendants' action must be continuous, as Defendants seems to claim.

As explained above in the First Amendment and Fourteenth Amendment sections, a major part of Plaintiffs' ministry involves one-on-one conversations and the handing out of gospel tracts. Pls' SOF ¶¶ 1, 4, 5. Plaintiffs were preventing from engaging in their tried and true methods of evangelism. Pls' SOF ¶ 5. This included being denied access to the sidewalk at Soldier Field, being denied access completely from Gateway Park, and being relegated to the south side of Addison Street instead of the north side where Plaintiffs' intended audience were passing. The facts clearly show that Defendants prevented Plaintiffs from furthering their ministerial objectives.

### B. Plaintiffs' Spoliation of Evidence Claim

Defendants claim that Plaintiffs cannot show that the loss of evidence prevents them from proving an otherwise valid cause of action. As indicated above, Plaintiffs have a reasonable probability of succeeding in the underlying claims against Defendants at Wrigley Field and Gateway Park. See *Farrar v. Yamin*, 261 F. Supp. 2d 987, 995 (N.D. Ill. 2003). The issue then becomes whether Plaintiffs can show that the loss of the video recordings proximately caused any injury. Here, Defendants damaged Plaintiff because Plaintiffs cannot now use that evidence in this case, which would have provided first-hand video evidence of the events that unfolded before and during the arrests of Michael Marcavage at Wrigley Field and James Deferio at Gateway Park. The destruction of this evidence has made this litigation much more difficult because evidence that would have been shown on the video tape is now unavailable. Specifically

in this case, the facts leading up to the arrest of Mr. Marcavage could have been demonstrated simply with the video. The lack of this evidence might lead to a verdict in favor of Defendants or, more likely a smaller jury award.

**C. Plaintiffs' Conversion Claim**

When Michael Marcavage was arrested, at 1:25 pm Central time, Officer Madrigal took Mr. Marcavage's video camera. Pls' SOF ¶¶ 30, 31. Madrigal put the camera in his pocket and transported it to the police station. Pls' SOF ¶ 31. Officer Madrigal had continuous possession of the video camera for several hours after the arrest of Mr. Marcavage. Pls' SOF ¶ 32. Officer Madrigal showed Mr. Marcavage that he had the video camera while Mr. Marcavage was in custody. Pls' SOF ¶ 32. The video tape that was in Michael Marcavage's video camera when he was arrested, was re-recorded over while in police custody, and now plays with a black picture and background noise suggesting the re-recording occurred in a motor vehicle while it was being driven. The date and time that the tape was recorded is July 22, 2006, 3:21 PM. Pls' SOF ¶ 36. At the time of the re-recording of the video tape (around 2:21 p.m. central time), the video tape was in the custody of Officer Madrigal, who stated that he kept possession of the video camera from the time of the arrest for several hours afterward. Pls' SOF ¶ 32.

When Officer Andrews arrested Mr. Deferio, he ordered him to put the camera down, which Deferio did after turning it off. Ans. SOF ¶ 39. Mr. Deferio attempted to secure the tape by removing it from the camera, but Officer Andrews told him not to touch the tape. Ans. SOF ¶ 39. After Marcavage was released from his handcuffs, he attempted to take the video camera with the tape inside with him but Officer Andrews insisted that Marcavage give him the camera. Ans. SOF ¶ 39. When release Mr. Deferio received his video camera without the tape inside. Ans. SOF ¶ 39. Officer Andrews told Deferio that he didn't know about any tape. Ans. SOF ¶ 39.

To prove causation Plaintiffs must established that Defendants wrongfully and without authorization assumed control, dominion, or ownership over the property. *Cirrincione v. Johnson*, 703 N.E.2d 67, 70, 184 Ill.2d 109, 114 (Ill. 1998). Defendants claim that there is no evidence beyond a mere possibility that Defendants converted the tapes. However, at Wrigley Field, the evidence clearly shows that Officer Madrigal had continuous possession of the video camera and tape for several hours after Marcavage was arrested and the re-recording of the video tape was within a few hours after the Marcavage arrest, during the time that Madrigal maintained

possession of the video. More than conjecture, the evidence heavily favors the conclusion that Officer Madrigal was responsible for taping over the evidence contained on the video tape. Further, the evidence shows that at Gateway Park, Officer Andrews took Mr. Deferio's camera with the tape in it, but when Mr. Deferio was released from holding, the tape was not in the camera. Mere than mere speculation, the evidence tends to establish that Officer Andrews was responsible for removing the tape from the camera.

**D. Deputy Chief Dugan**

Plaintiffs concede that there is no evidence against Deputy Chief Dugan that could hold him liable for the spoliation and conversion claims.

**VII. DEFENDANTS ARE NOT IMMUNE FROM PLAINTIFFS' STATE LAW CLAIMS**

Defendants claim that they are immune under the Local Government and Governmental Employees Tort Immunity Act, 745 ILCS 10/1-101 *et seq*. ("Immunity Act"). The Illinois Supreme Court has interpreted the statute:

> According to the statute, an employee may be granted immunity if he holds either a position involving the determination of policy or a position involving the exercise of discretion. The statute is equally clear, however, that immunity will not attach unless the plaintiff's injury results from an act performed or omitted by the employee in determining policy and in exercising discretion. The employee's position thus may be one which involves either determining policy or exercising discretion, but, as the appellate court correctly held, the act or omission must be both a determination of policy and an exercise of discretion.

*Harinek v. 161 N. Clark St. Ltd. Pshp.*, 692 N.E.2d 1177, 1181, 181 Ill. 2d 335, 341 (Ill. 1998). Policy decisions made by a municipality are defined as those decisions which require the municipality to balance competing interests and to make a judgment call as to what solution will best serve each of those interests. *Id.* The Illinois Supreme Court has thus made it clear that the statute was intended to protect not every exercise of discretion by a public officer, but only those involving a determination of policy.

Here, the acts by Defendants in destroying or altering Plaintiffs' video tapes were not policy decisions, or even matters of discretion. Further, as Defendants describe it, the acts of destroying or altering the video tapes were also willful and wanton, in that they showed an indifference to or conscious disregard for Plaintiffs' property. See 745 ILCS 10/1-210. Therefore, Defendants are not immune to Plaintiffs spoliation or conversion claims.

With respect to the RFRA claim, the acts by Defendants in preventing Plaintiffs from access to sidewalks and Gateway Park are not policy decisions.  The decisions were not made on the basis of competing interests, but were made in violation of Plaintiffs well-established rights.  Defendants cannot make a policy decision to deny Plaintiffs of their constitutional rights in favor of other interests.  Therefore, Defendants are not immune from Plaintiffs' state law claims.

## <u>CONCLUSION</u>

For the aforementioned reasons, the Court should deny Defendants' Motion for Summary Judgment.

Dated: January 30, 2009.

Respectfully submitted,
MAUCK & BAKER, LLC

 /s/ Andy Norman

Andy Norman
John Mauck
Jeffrey M. Schwab
Mauck & Baker, LLC
One N. LaSalle St., Ste. 600
Chicago, IL 60602
(312) 726-1243

F:\Clients\2598\Summary Judgment\Response to City's MOT SJ\RESP_DefsMOTSJ_Memorandum.doc