IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL MARCAVAGE, et al.,          )
                                    )
                Plaintiffs,         )
                                    )
     v.                             )     No.  06 C 3858
                                    )
CITY OF CHICAGO, et al.,            )
                                    )
                Defendants.         )

<u>MEMORANDUM OPINION AND ORDER</u>

Michael Marcavage ("Marcavage"), James ("James") and Faith
Deferio (collectively "the Deferios") have brought this action
against the City of Chicago ("City"),[1] the Metropolitan Pier and
Exposition Authority ("Authority") and a number of City's police
personnel,[2] charging each with violations of plaintiffs'
constitutional civil rights in connection with their protest
activities during Chicago's Gay Games.  Plaintiffs have brought a
motion for partial summary judgment under Fed.R.Civ.P.("Rule")
56, and City and the individual officers other than Rodriguez
(see n.2) have cross-moved for summary judgment.  For the reasons
stated here, defendants' motion is granted while plaintiffs' is
denied, and this action is dismissed as to the moving defendants.

---

[1]  Following this Court's June 5, 2008 oral ruling, a
certification of indemnification was filed by City and its motion
to stay <u>Monell</u> discovery was granted.

[2]  Those comprise Officers Adam Andrews ("Andrews"),
Rodriguez and Gerardo Madrigal ("Madrigal"), Sergeant Gerardo
Teneyuque ("Teneyuque") and Chief Daniel Dugan.  It is unclear
why Rodriguez is sued, for he is not referred to in any of the
parties' memoranda.

## Summary Judgment Standard

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)).  For that purpose courts consider evidentiary records in the light most favorable to nonmovants and draw all reasonable inferences in their favor (<u>Lesch v. Crown Cork & Seal Co.</u>, 282 F.3d 467, 471 (7th Cir. 2002)).  But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (<u>Pugh v. City of Attica</u>, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (<u>id.</u>).  Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).

One more complexity is added where, as here, cross-motions for summary judgment are involved.  Those same principles require the adoption of a dual perspective that this Court has sometimes referred to as Janus-like:  As to each motion the nonmovant's version of any disputed facts must be credited.  What follows, then, is a summary of the facts in those terms.[3]

---

[3]  LR 56.1 implements Rule 56 by requiring each party to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which are agreed upon. This opinion identifies plaintiffs' and defendants' respective submissions as "P." and "D.," followed by appropriate

**Background**

Marcavage and the Deferios are volunteers with Repent America, an evangelistic organization based in Philadelphia, Pennsylvania (D. St. ¶9).  Repent America's goal is to proclaim the Gospel of Jesus Christ publicly through prayer, the display of signs, the distribution of religious literature and public preaching (P. St. ¶1; D. St. ¶9).

From July 15 to July 22, 2006[4] Chicago was the host city for the Gay Games ("Games"), an athletic and cultural event held once every four years "to foster and augment the self-respect of lesbians and gay men throughout the world and to engender respect and understanding from the nongay world" (D. St. ¶13).  Marcavage and the Deferios traveled to Chicago during the Games to evangelize and preach and specifically sought to communicate to homosexuals in attendance that homosexuality is a sin (D. St. and P. Resp. St. ¶14).  Their claims in this action relate to Games events held at Soldier Field, Navy Pier (sometimes referred to simply as "the Pier") and Wrigley Field.

**Soldier Field**

Soldier Field was the location for the opening ceremonies of

---

designations: LR 56.1 statements as "St. ¶--," responsive statements as "Resp. St. ¶--" and memoranda as "Mem.--," "Resp. Mem.--" and "Reply Mem.--."

[4]  Because all the operative events took place over a span of just a few days, all future date references will omit the year designation--2006.

the Games on July 15 (D. St. ¶15). During that afternoon plaintiffs preached, held signs and attempted to distribute religious literature and talk with Games attendees on a public walkway near Soldier Field (P. St. ¶3; D. St. ¶16). Although they wished to stand on a sidewalk directly across from an entrance to the Field Museum, plaintiffs were directed to move to a gravel area east of that sidewalk (P. St. ¶7; D. St. ¶18). Deputy Chief Daniel Dugan ("Dugan"), the Chicago Police Commander for the opening ceremonies, told plaintiffs that if they remained on the sidewalk, they would be arrested (P. St. ¶6; D. St. ¶18).

While on the gravel space plaintiffs were free to engage in expressive activities, including preaching to passersby, holding signs, distributing pamphlets and using bullhorns (D. St. ¶19). According to plaintiffs, however, they were unable to communicate effectively with their intended audience (homosexuals attending and participating in the Games) from that location because the participants did not walk directly in front of them, making it difficult to engage in one-on-one conversations or to give them religious tracts (P. Resp. St. ¶19). Other people opposing the Games engaged in expressive conduct at that same location (D. St. ¶20).

After some time Marcavage left the gravel space and joined a conversation between police officers and two other protesters not affiliated with Repent America (D. St. ¶23). Police officers

explained to Marcavage that demonstrators were free to preach on the sidewalks as long as they remained moving, but they could not stop on the sidewalks to do so (D. St. ¶24).  Dugan told Marcavage that he could demonstrate while standing still anywhere along the sidewalk as long as he remained on the grass alongside the sidewalk, rather than on the sidewalk itself (id.).  About the same time a man was standing still selling newspapers on a paved sidewalk west of the area where plaintiffs sought to demonstrate (P. St. ¶8; D. St. ¶25).  Dugan told Marcavage that the man could stay there because that was "freedom of the press" (P. St. ¶8).

**Navy Pier**

Navy Pier is owned by Authority, an Illinois governmental unit (D. St. ¶5).  Gateway Park is located just west of the Pier and provides a dramatic entrance to the Pier's facilities.  As stated in Authority's "Policy for Public Expression at Navy Pier and the Headlands," anyone wishing to engage in public expression on Navy Pier or in Gateway Park must first obtain a permit from Authority (D. St. ¶29).

On July 16 plaintiffs went to Navy Pier, the location of a Games event, to engage in public expression of their religious message (P. St. ¶13; D. St. ¶29).  After plaintiffs left the parking garage, Navy Pier security guards informed them that they could not demonstrate on Navy Pier without a permit (P. St. ¶14;

D. St. ¶32). According to plaintiffs, they did not want to
obtain a permit because they wished to remain anonymous and did
not want to put their names on a document that might cause them
to be harassed, nor could they plan ahead,[5] thus requiring them
to engage in spontaneous rather than planned speech (P. St. ¶16).

When plaintiffs arrived at the walkway in front of the Pier,
the guards directed them to cross the street toward Gateway Park.
But plaintiffs refused to do so, instead walking south along the
sidewalk in front of Navy Pier's main entrance (D. St. ¶33).
They then encountered Officer Andrews, who had already been
working at Navy Pier for a few days and who had been called by
Navy Pier's security guards for assistance (D. St. ¶34). After
conferring with the guards, Andrews told plaintiffs that they
needed to cross the street to Gateway Park or they would be
arrested (P. St. ¶19; D. St. ¶¶34-35).

Plaintiffs, along with other members of their group, then
walked westward across the street and arrived at the sidewalk on
the eastern edge of Gateway Park (D. St. ¶36). Andrews then told
them that they could not remain there either because they did not
have a permit, so they had to move west past the western edge of
the park or they would be arrested (id.; P. St. ¶22). While other
members of the group, including James, began to walk westward in

---

[5] Plaintiffs state that they "could not plan ahead because
they did not know the city and did not know where the Gay Games
events were to be held" (P. St. ¶16).

compliance with Andrews' orders, Marcavage continued to question Andrews' directive and called 911 to talk to a supervising officer (P. St. ¶27; D. St. ¶38 ).  At that point Andrews handcuffed Marcavage (P. St. ¶27).

As he was walking west into Gateway Park, James began to record the events on his video camera (P. St. ¶28).  After he walked about 50 feet into the park, James turned around and started walking back toward Andrews and Marcavage (D. St. ¶39).  Once he was within 20 feet of them, Andrews arrested James for criminal trespass at Navy Pier (P. St. ¶33; D. St. ¶39).

Sergeant Kelly Braithwaite then arrived on the scene, and Andrews released Marcavage from the handcuffs (P. St. ¶29).  James, on the other hand, was taken to the police station, where Andrews completed the arrest reports and case reports for the arrest (P. St. ¶30; 32).  After the arrest Marilynn Gardner, the general manager of the Pier, told police she did not want to press charges against James, and he was released (P. St. ¶38).

**Wrigley Field**

Closing ceremonies for the Games were held at Wrigley Field on July 22.  Plaintiffs arrived at various nearby locations and began to demonstrate at approximately 1 p.m. (D. St. ¶40).  At about 1:35 p.m. Marcavage began to walk east from the sidewalk at the southwest corner of Wrigley Field along the north side of the street (P. St. ¶49; D. St. ¶41).  In one hand Marcavage carried a

video camera, which he was using to record the events, and in the other hand he carried a sign stating that homosexuality is a sinful perversion and that marriage is between one man and one woman (P. St. ¶¶48-49; D. St. ¶41). As he walked, Marcavage passed a man handing out literature on the sidewalk, a person waving a gay pride flag in the plaza outside of Wrigley Field and a man protesting President Bush (P. St. ¶49; D. St. ¶42).

Marcavage stopped on the sidewalk immediately west of the crosswalk on Sheffield Avenue at the southeast corner of Wrigley Field (P. St. ¶53; D. St. ¶49). Sergeant Teneyuque then approached Marcavage and directed him to keep walking (P. St. ¶53; D. St 50). Marcavage responded that he had a right to be on the public sidewalk and was not blocking anyone (P. St. ¶54; D. St. ¶50). As Marcavage continued to insist that he had a right to stand there, a Wrigley Field employee told Marcavage that he needed to cross the street because he was standing on Wrigley Field property during a permitted event (D. St. ¶51).

Also during this time, a man protesting about President Bush came onto the same corner where Marcavage and Teneyuque were standing (D. St. ¶52). Teneyuque then said that everybody had to cross the street (D. St. ¶53). At his direction the protester moved back to the area north of the crosswalk on Sheffield Avenue, where he had been earlier (id.).

Marcavage, however, refused to move from the sidewalk and

continued to object to Teneyuque's repeated directions (D. St. ¶53). He then crossed to the south side of the street, briefly spoke to James and exchanged videotapes with him and then returned to the same location from which Teneyuque had told him to move (P. St. and D. St. ¶55). Teneyuque again approached Marcavage and told him he could not stand in one place and instructed him to cross the street (P. St. ¶57; D. St. ¶56). After Marcavage again refused, he was arrested for disorderly conduct (P. St. ¶¶58-59, 66; D. St. ¶¶56-57).[6]

Marcavage videotaped the entire exchange with Teneyuque: Their initial encounter was preserved on the videotape Marcavage gave to James, and the later encounter was recorded on the videotape that he received from James when he crossed the street (P. St. ¶60). Marcavage's camcorder was still on and recording when it was taken from him by Officer Madrigal after his arrest (P. St. ¶64; D. St. ¶58). Madrigal had possession of the video camera for a period of time after Marcavage's arrest (P. St. and D. Resp. St. ¶65). When played back, the tape that was in that video camera now shows just a black picture with background noise (P. St. ¶72).

---

[6] According to Teneyuque and Officer Madrigal, who was also involved in Marcavage's arrest, a man named Phil Johnson ("Johnson") had also complained to the officers that Marcavage was blocking him from entering the sidewalk (P. St. ¶¶68-71). Plaintiffs contend that the incident between Marcavage and Johnson was brief and did not involve a physical confrontation, as Teneyuque and Madrigal have suggested (P. St. ¶69).

## First Amendment Claims

Marcavage and the Deferios assert that their First Amendment rights were violated by the restrictions imposed by defendants on their protest activities at Soldier Field, Navy Pier and Wrigley Field.  Whether and to what extent the First Amendment permits the regulation of access to government property is determined by how that property is characterized.  In traditional public forums, places such as streets and parks that have long been devoted to assembly and debate, the government's ability to regulate expressive activity is limited (<u>Perry Educ. Ass'n v. Perry Local Educators' Ass'n</u>, 460 U.S. 37, 45-46 (1983)).  Any content-based exclusion is subject to strict scrutiny--that is, the government "must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end" (<u>id</u>. at 45).  Reasonable time, place and manner regulations that are content-neutral are permissible, so long as they "are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication" (<u>id</u>.).

Defendants do not seem to dispute that the locations at issue in this litigation--the areas near Soldier Field, Gateway Park and Wrigley Field where plaintiffs demonstrated--would be considered traditional public forums subject to heightened First

Amendment protections.[7]  Instead they argue that the restrictions
imposed on plaintiffs' expressive activities were reasonable and
content-neutral time, place and manner restrictions and were
therefore permissible without running afoul of plaintiffs' First
Amendment rights.

As to whether a regulation is content-neutral, the principal
inquiry "is whether the government has adopted a regulation of
speech because of disagreement with the message it conveys" (Ward
v. Rock Against Racism, 491 U.S. 781, 791 (1989)).  In that
regard the government's purpose, not the regulation's effect, is
controlling (id.):

> A regulation that serves purposes unrelated to the
> content of expression is deemed neutral, even if it has
> an incidental effect on some speakers or messages but
> not others.

This opinion turns then to the specific restrictions that
plaintiffs assert were violative of their First Amendment
freedoms.  As before, the three locations at issue will be
considered separately.

**Soldier Field**

Plaintiffs contend that Dugan's orders to move to the gravel
portion of the sidewalk, rather than permitting them to occupy
the paved sidewalk closer to the entrance to Soldier Field, was

---

[7]  Although the later discussion reflects that our Court of
Appeals has taught that Navy Pier is not a traditional public
forum, it has nevertheless limited Authority's ability to
regulate First Amendment activities there.

an impermissible content-based restriction that served no
legitimate purpose and failed to leave open alternative channels
of communication.  They advance several arguments in support of
their position.

First they contend that the basis for Dugan's regulation was
the content of plaintiffs' speech because (1) Games attendees
were permitted to walk on the sidewalk and display their pro-
homosexual views through signs, chants and clothing and (2) a man
selling newspapers in a different area was allowed to remain on a
paved sidewalk (P. Mem. 7).  But both of those arguments are
flawed.

Plaintiffs' effort to characterize the difference between
themselves and Games attendees as one purely of viewpoint ignores
the more relevant aspect of Dugan's order:  Those attendees were
<u>walking</u> toward Soldier Field, so that their presence on the
sidewalk (unlike that of plaintiffs) posed no threat to the
orderly flow of pedestrian traffic.  Indeed, Dugan explained to
Marcavage that he--like the Games attendees--was free to preach
on the sidewalks as long as he kept moving (D. St. ¶24).  Dugan's
directive applied equally to those who supported and opposed
homosexuality, for it was based on the need to control pedestrian
traffic along the sidewalk leading to Soldier Field.

As for the man selling newspapers, plaintiffs' videotaped
evidence shows that the man was standing on a sidewalk a fair

distance away from the crowds and the busy sidewalk that plaintiffs desired to occupy (P. DVD 1). Dugan's regulation of the busy sidewalk--his direction that pedestrians keep moving and refrain from standing still--did not apply differently to the man selling newspapers because of his viewpoint. Instead it simply did not apply to the newspaper seller, because he was not in the area that needed regulation in the interest of controlling the sidewalk traffic. Hence Dugan's regulation must be deemed neutral even though it had "an incidental effect on some speakers...but not others" (Ward, 491 U.S. at 791).

Because all of Dugan's regulation was thus content-neutral, it passes constitutional muster so long as it was narrowly tailored to serve a significant government interest and it left open ample alternative channels of communication (Perry Educ. Ass'n, 460 U.S. at 45). Courts have generally and consistently found it "clear that a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective" (Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 650 (1981)). As part of that safety, "the organized, effective, and safe flow of traffic" has also been held to be a significant government interest (MacDonald v. City of Chicago, 243 F.3d 1021, 1034 (7th Cir. 2001); see also Int'l Soc'y for Krishna Consciousness, Inc. v. Rochford, 585 F.2d 263, 268-69 (7th Cir. 1978)). Even more specifically, a "State's

interest in confining distribution, selling, and fund solicitation to fixed locations is sufficient to satisfy the requirement that a place or manner restriction must serve a substantial state interest" (<u>Heffron</u>, 452 U.S. at 654).

Plaintiffs don't spend much time disputing that the orderly and effective flow of pedestrian traffic constitutes a significant government interest.  They argue instead that the restriction imposed by Dugan was not narrowly tailored to serve that interest, because plaintiffs were prohibited from standing still on the sidewalk whether they were actually blocking anyone or not.

As a general matter, "a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but...it need not be the least restrictive or least intrusive means of doing so" (<u>Ward</u>, 491 U.S. at 798).  Although such restrictions cannot substantially burden speech more than is necessary, "the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative" (<u>id</u>. at 800).

Plaintiffs' contention that Dugan's order to keep moving along the sidewalk was not narrowly tailored because it applied whether there was an actual blockage of pedestrian traffic or not is misplaced, particularly in light of the just-articulated less

exacting standard.  Courts have routinely analyzed the validity

of regulations and ordinances in light of the impact on public

safety and potential dangers presented by certain circumstances

(see Heffron, 452 U.S. at 653; MacDonald, 243 F.3d at 1034; Graff

v. City of Chicago, 9 F.3d 1309, 1320-21 (7th Cir. 1993)).

Plaintiffs' suggestion that Dugan's regulation was overly broad

because it was not limited to the actual, rather than potential,

impedance of pedestrian traffic is simply unpersuasive.[8]

     Finally, plaintiffs argue that Dugan's order to remain on

the gravel area rather than the sidewalk itself did not leave

open ample alternative channels of communication.  Although they

acknowledge that they were free to preach and hold signs in that

area, they contend that they were unable to reach their target

audience--homosexuals and other Games attendees--through engaging

in one-on-one conversations and handing out religious pamphlets

(P. Mem. 10).

     Although the First Amendment does protect a person's right

to engage in expressive activity in public areas, it "does not

guarantee the right to communicate one's views at all times and

places or in any manner that may be desired" (Heffron, 452 U.S.

at 647)).  As Gresham v. Peterson, 225 F.3d 899, 906 (7th Cir.

_____

     [8]  Moreover, plaintiffs' argument assumes that they would
not have been blocking anyone had they been preaching on the
sidewalk.  That assumption is at odds with the highly congested
nature of that sidewalk, as depicted by plaintiffs' own
videotaped evidence.

2000)(internal citation omitted) has explained:

> An adequate alternative does not have to be the speaker's first or best choice or one that provides the same audience or impact for the speech.

Thus courts have repeatedly found that regulations that designate fixed locations or specific zones for protesters and leafletters are permissible time, place and manner restrictions (see <u>Heffron</u>, 452 U.S. at 654; <u>Hill v. Colorado</u>, 530 U.S. 703, 727 (2000)).

Despite what plaintiffs may believe was their ideal spot for demonstrating, the gravel area just east of the sidewalk was an adequate alternative channel of communication for the expression of their views. From that spot plaintiffs were free to preach, hold signs, engage in conversations and pass out literature.

Plaintiffs claim that they were unable to hand out pamphlets because Games attendees did not walk close enough past them. But certainly had any of those attendees been interested in speaking with plaintiffs or receiving their literature, they could easily have done so. That plaintiffs were not in a position to forcibly engage in conversations, or to pass papers to pedestrians who had not expressed an interest in receiving them, does not make the designated area inadequate for First Amendment purposes.

In sum, Dugan's directive to plaintiffs at Soldier Field was a valid time, place and manner restriction that did not run afoul of plaintiffs' First Amendment rights. On then to the other locations.

**Navy Pier**

Plaintiffs also contend that their First Amendment rights were violated when they were prevented from engaging in expressive activity at Navy Pier and Gateway Park. But analysis defeats that contention as well.

As an initial matter, our Court of Appeals has taught that although the sidewalks and other public areas at Navy Pier are not public forums, Authority may not completely ban leafletting in those areas (Chicago Acorn v. Metro. Pier & Exposition Auth., 150 F.3d 695, 702-03 (7th Cir. 1998)). Chicago Acorn, id. at 703 also recognized that Gateway Park is a traditional public forum for purposes of regulating First Amendment activities.

Even though defendants acknowledge that the ability to regulate speech in Navy Pier and Gateway Park is thus limited, they maintain that pursuant to Authority's written policy it may legitimately require persons wishing to engage in expressive activities to obtain a permit first. On the other side of the coin, plaintiffs admit that they made no effort at all to obtain such a permit, claiming that they wished to remain anonymous and could not plan ahead for the activities.[9]

It was not until their reply memorandum that plaintiffs

---

[9] As stated earlier, plaintiffs offer up such excuses as their not knowing Chicago well and not knowing where the Games were to be held. Those are the types of frivolous arguments that lawyers ought to avoid.

confronted the permit requirement. Until then they impermissibly distorted the issues by asserting that Andrews' directive to remain outside of Navy Pier and Gateway Park was an absolute prohibition on speech that could not be justified by any government interest and that did not leave open ample alternative channels of communication. And when they did finally come to grips with the real issue, they left it unclear whether they were challenging the permit requirement on its face or as applied.

This Court would be inclined to assume a facial challenge, based on plaintiffs' assertion that the permit requirement "is not narrowly tailored to a legitimate government interest, and is overbroad" (P. Reply Mem. 9). But despite that "overbroad" characterization, plaintiffs rather seem to argue that any system that requires a permit for public demonstrations and expressions of speech is per se violative of the First Amendment.

Any such assertion requires little response, for it has long been recognized that "[p]ermit requirements are routinely imposed on the use of public parks and other public spaces for expressive uses..." (Blue Canary Corp. v. City of Milwaukee, 251 F.3d 1121, 1123 (7th Cir. 2001)). Indeed, Thomas v. Chicago Park Dist., 534 U.S. 316 (2002) specifically upheld Chicago's municipal park ordinance that required individuals to obtain a permit before conducting certain events in parks and other public property.

Plaintiffs' attempted invocation of Watchtower Bible & Tract

18

<u>Soc'y of New York, Inc. v. Village of Stratton</u>, 536 U.S. 150
(2000) does not aid them.  <u>Watchtower</u> was a continuation of the
long string of Jehovah's Witness cases that have dealt with
restraints on door-to-door canvassers who go onto private
residential property--a circumstance wholly different from the
establishment of reasonable and narrow constraints on the use of
public property.  So with nothing more than a failed reliance on
<u>Watchtower</u> to invalidate Authority's permit policy, again
plaintiffs lose on their contention that the policy was not a
content-neutral time, manner and place regulation.

**Wrigley Field**

Plaintiffs also challenge Teneyuque's order that prohibited
Marcavage from standing still at the southeast corner of Wrigley
Field, in much the same way as they did Dugan's similar order at
Soldier Field.  According to plaintiffs, Teneyuque's order was
not a reasonable time, place and manner restriction because it
was not content-neutral in the way it was applied.

To that end plaintiffs argue that other persons expressing
various views in and around the Wrigley Field area were not
directed to keep moving on the sidewalk or to cross the street,
as Marcavage was.  While the video footage recorded by Marcavage
does show that he passed some other demonstrators as he walked
around the Wrigley Field area, it also shows that Marcavage was
instructed to keep moving or to cross the street only when he was

standing at a busy corner near the entrance to Wrigley Field and at the intersection of two crosswalks leading to the venue (D. St. ¶¶42, 44, 50-51).  Other members of Repent America were allowed to demonstrate in other less crowded areas without any interference by police officers, just as were the other people whom Marcavage videotaped (D. St. ¶¶60-66). Moreover, Teneyuque's order cannot be said to have been applied based on the substance of Marcavage's speech:  Teneyuque also directed the man protesting President Bush to leave the same corner when he stood there (D. St. ¶¶52-53).  Given those facts, it can only be concluded that Teneyuque's restriction of the sidewalk was a content-neutral regulation that applied to anyone standing in that specific area, regardless of his views on homosexuality or politics.

As such, the First Amendment analysis of Teneyuque's order to remain moving on the busy sidewalk follows the same path as Dugan's order at Soldier Field.  For the same reasons explained there, Teneyuque's order was narrowly tailored to serve a significant government interest:  the safe and orderly flow of pedestrian traffic.  There can be no doubt that it left open ample alternative channels of communication, as the Deferios and other members of Repent America freely demonstrated in other areas around Wrigley Field.  Once again Marcavage loses.

## Equal Protection Claims

Plaintiffs also assert equal protection violations by the defendant police officers at Soldier Field and Wrigley Field. Under the Fourteenth Amendment's Equal Protection Clause, no State may "deny to any person within its jurisdiction the equal protection of the laws." That of course "is essentially a directive that all persons similarly situated should be treated alike" (City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)). As Smith v. Severn, 129 F.3d 419, 429 (7th Cir. 1997) has further explained:

> An equal protection violation occurs only when different legal standards are arbitrarily applied to similarly situated individuals.

That scotches plaintiffs' claim. No one situated similarly to Marcavage at either Soldier Field or Wrigley Field was treated differently or more favorably than he was. It has already been shown that none of the other protesters at the Games' opening and closing ceremonies was allowed to stand at the same place where Marcavage wanted to be. To the contrary, the only protester who did attempt to stand still at the same spot as Marcavage--the political protester at Wrigley Field--was directed to move, just as Marcavage was.

Without the identification of any similarly situated person for comparison purposes, it cannot be said that a different legal standard was arbitrarily applied to Marcavage in violation of the

Fourteenth Amendment.  Plaintiffs' equal protection claims
therefore fail without any need for further analysis.

**Fourth Amendment Claims**

Plaintiffs' final constitutional claims assert that James'
arrest and Marcavage's detention at Navy Pier and Marcavage's
arrest at Wrigley Field violated their rights under the Fourth
Amendment.  As <u>Devenpeck v. Alford</u>, 543 U.S. 146, 152 (2004)
(citations omitted) states:

> The Fourth Amendment protects "[t]he right of the people to
> be secure in their persons, houses, papers, and effects,
> against unreasonable searches and seizures."  In conformity
> with the rule at common law, a warrantless arrest by a law
> officer is reasonable under the Fourth Amendment where there
> is probable cause to believe that a criminal offense has
> been or is being committed.

Police "have probable cause to arrest an individual when the
facts and circumstances within their knowledge and of which they
have reasonably trustworthy information are sufficient to warrant
a prudent person in believing that the suspect had committed or
was committing an offense" (<u>Kelley v. Myler</u>, 149 F.3d 641, 646
(7th Cir. 1998)(internal quotation marks and brackets omitted)).
As <u>Devenpeck</u>, 543 U.S. at 543 later went on to say:

> Our cases make clear that an arresting officer's state
> of mind (except for the facts that he knows) is
> irrelevant to the existence of probable cause.

Instead the probable cause inquiry is an objective one, based
"not on the facts as an omniscient observer would perceive them,
but rather as they would have appeared to a reasonable person in

22

the position of the arresting officer" (<u>Mustafa v. City of</u>
<u>Chicago</u>, 442 F.3d 544, 547 (7th Cir. 2006)(internal quotation
marks omitted)).

**Navy Pier**

Plaintiffs argue that Andrews did not have probable cause to
arrest James or detain Marcavage because Navy Pier security
guards did not tell Andrews that they wished to have them
arrested for trespass.  According to Illinois' criminal trespass
statute (720 ILCS 5/21-3(a)(3)), an individual commits the
offense of criminal trespass if he "remains upon the land of
another, after receiving notice from the owner or occupant to
depart."  Law enforcement officers are authorized to remove an
individual or make an arrest after the individual refuses to
vacate the premises at the officer's direction (see, e.g., <u>United</u>
<u>States v. Kincaid</u>, 212 F.3d 1025, 1029 (7th Cir. 2000)).

In attempted support of their position, plaintiffs make much
of the process by which the criminal complaint against James was
signed and the fact that Navy Pier management ultimately decided
not to press charges against him.  They also focus on whether
Andrews himself was subjectively aware of Authority's permit
policy.  But those things are nothing more than an effort to
shift the focus away from a proper probable cause analysis.

In that respect the relevant inquiry is whether the facts
and circumstances, as known to Andrews at the time of the arrest,

23

were sufficient to warrant a belief that James and Marcavage were committing criminal trespass by remaining on and returning to Navy Pier.[10]  In those terms the answer is clearly "yes."

It will be recalled that Andrews was called by Navy Pier security personnel for assistance (D. St. ¶34).  Andrews knew that James and Marcavage had been warned repeatedly by Navy Pier security guards, as well as by himself, that they were not permitted on Navy Pier without a permit (D. St. ¶¶33-35).  Marcavage ignored those warnings and remained on Navy Pier property to argue with Andrews (D. St. ¶38).  And although James initially followed Andrews' directive, he then turned around and walked back to Navy Pier (D. St. ¶39).

Whether or not James' and Marcavage's actions in fact constituted trespass is not the issue.  What is plain is that Andrews' knowledge and information gave him probable cause to believe that they were committing the offense by remaining on the property.  As such, their Fourth Amendment rights were not violated.

**Wrigley Field**

As their final charge of Fourth Amendment violations, plaintiffs assert that Teneyuque and Madrigal lacked probable

---

[10]  Satisfaction of that test more than meets the Fourth Amendment's lesser standard of reasonable suspicion that applies to a brief investigative stop (see <u>United States v. Askew</u>, 403 F.3d 496, 507 (7th Cir. 2005)).

cause to arrest Marcavage for disorderly conduct during the Games' closing ceremonies at Wrigley Field. Just as with the Navy Pier situation, plaintiffs rely largely on what they contend the officers subjectively believed to be grounds for the arrest. Specifically plaintiffs suggest that Teneyuque and Madrigal arrested Marcavage because he blocked Johnson, and they argue that the evidence in that regard does not support a probable cause determination (P. Mem. 25-26).

Exactly what happened between Marcavage and Johnson is disputed by the parties, and defendants also dispute plaintiffs' characterization of the weight that encounter carried in the officers' decision to arrest Marcavage. But none of that is really relevant to the Fourth Amendment analysis. Instead the proper question is whether the facts as a whole would give a reasonable police officer probable cause to believe that Marcavage was committing disorderly conduct.

Under Illinois law (720 ILCS 5/26-1(a)(1)):

A person commits disorderly conduct when he knowingly:

    (1)   Does any act in such an unreasonable manner as to alarm or disturb another and to provoke a breach of the peace....

Because the definition of disorderly conduct is inherently imprecise, courts have concluded that "whether particular conduct is disorderly conduct depends not only on the conduct itself but also on the conduct's unreasonableness in relation to the

surrounding circumstances" (Lester v. City of Chicago, 830 F.2d 706, 714 (7ᵗʰ Cir. 1987), citing Illinois caselaw).

On that score Jones v. Watson, 106 F.3d 774, 779 (7ᵗʰ Cir. 1997) and the Illinois Supreme Court cases it cites for the following proposition are directly on point:

> It is well-established in Illinois that the act of blocking the free flow of pedestrian or vehicular traffic on public ways will support a conviction for the offense of disorderly conduct.

Moreover, although arguing with a police officer does not of itself constitute disorderly conduct, it can rise to that level if officers reasonably believe that the argument threatens a breach of the peace (Biddle v. Martin, 992 F.2d 673, 677 (7ᵗʰ Cir. 1993)). Refusal to obey a lawful order may also give rise to a disorderly conduct charge (Ryan v. County of DuPage, 45 F.3d 1090, 1093 (7ᵗʰ Cir. 1995)).

In light of those standards and the totality of the circumstances, Teneyuque and Madrigal unquestionably had probable cause to arrest Marcavage for disorderly conduct. Even when it is assumed that plaintiffs' version of Marcavage's encounter with Johnson is correct and that there was no threat of physical confrontation between the two, it is undisputed that Marcavage repeatedly ignored--indeed, challenged--Teneyuque's order to move across the street or to keep moving on the sidewalk to prevent disruptions in pedestrian traffic (D. St. ¶¶50-51, 53, 56-57). In direct violation of that order, Marcavage remained standing on

the busy sidewalk (id.).  Marcavage's brief encounter with
Johnson, if indeed it was nothing else, demonstrated at the very
least the potential for Marcavage's conduct to cause a breach of
the peace.

Those facts alone suffice to establish probable cause for
Marcavage's arrest.  Marcavage's Fourth Amendment claim related
to his arrest at Wrigley Field therefore fails as well.

### Qualified Immunity

What has gone before torpedoes all of plaintiffs' claims in
substantive terms.  But because the parties have also expended
considerable effort on the other (and alternative) string to the
individual defendants' legal bow--the doctrine of qualified
immunity--this opinion goes on to discuss that subject as well.

Qualified immunity is designed to shield government agents
"from liability for civil damages insofar as their conduct does
not violate clearly established statutory or constitutional
rights of which a reasonable person would have known" (Harlow v.
Fitzgerald, 457 U.S. 800, 818 (1982)).  In that respect Pearson
v. Callahan, 129 S.Ct. 808 (2009) has just overridden the
previously mandatory two-step evaluation decreed by Saucier v.
Katz, 533 U.S. 194, 200-01 (2001).

Because Pearson, 129 S.Ct. at 818 leaves it to the lower
federal courts to decide "which of the two prongs of the
qualified immunity analysis should be addressed first in light of

27

the circumstances in the particular case at hand" (accord, such cases as Chaklos v. Stevens, 560 F.3d 705, 711 (7th Cir. 2009) and Narducci v. Moore, No. 06-3427, 2009 WL 1956327, at *3 (7th Cir. July 9)), this Court turns directly to the question whether any purported constitutional right that defendants assertedly violated was "clearly established," such that a reasonable official would have known that his conduct was unlawful (Saucier, 533 U.S. at 201-02). To that end a plaintiff must "point to closely analogous cases" or show that the right is "so clear...that no one thought it worthwhile to litigate the issue" (Dunn v. City of Elgin, 347 F.3d 641, 650 (7th Cir. 2003), drawing that last quotation from Brokaw v. Mercer County, 235 F.3d 1000, 1022 (7th Cir. 2000)).

That requires a showing of more than a mere "broad general proposition" (Saucier, 533 U.S. at 201). Instead "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right" (Anderson v. Creighton, 483 U.S. 635, 640 (1987)). As Doyle v. Camelot Care Ctrs., Inc., 305 F.3d 603, 620 (7th Cir. 2002)(internal citation and quotation marks omitted) has elaborated on that concept:

> We often have observed that a plaintiff may overcome a
> claim of qualified immunity by presenting case law that

has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand. However, it is not the simple existence of analogous case law that defeats the claim of qualified immunity; rather, these decisions must demonstrate that, at the time the defendants acted, it was certain that their conduct violated the law.

In those terms the individual defendants' invocation of the qualified immunity defense independently nails shut the coffin of plaintiffs' First and Fourth Amendment claims against them. At both Soldier Field and Wrigley Field, the individual defendants' imposed restriction--their requirements that plaintiffs keep moving while on certain busy sidewalks or remain in other fixed locations while demonstra-ting--was essentially the same. Nothing in preexisting caselaw gave plaintiffs a clearly established right to flout those conditions.

This case does not present the simple question whether plaintiffs have a First Amendment right to engage in expressive conduct, including leafletting, in public forums such as Soldier Field and Wrigley Field. Instead the relevant consideration here is whether the individual defendants' restriction of plaintiffs' activity to certain areas near those venues was a content-neutral time, manner and place regulation that survives First Amendment scrutiny. And given the existence of caselaw approving the designation of fixed locations for demonstrations such as plaintiffs' (see, e.g., Heffron, 452 U.S. at 654 and Hill, 530 U.S. at 727) and the failure of plaintiffs to identify any cases

that suggest such restrictions are plainly unconstitutional, the "clearly established" standard has not been met.

That is equally true as to plaintiffs' activities at Navy Pier. Again ignoring Authority's written policy requiring a permit for engaging in expressive activity at Navy Pier and Gateway Park, plaintiffs claim that because Gateway Park is a traditional public forum, the government may not prohibit all communicative activity there (P. Resp. Mem. 19). So, they say, it was clearly established that Authority could not restrict plaintiffs' free speech activity there (id.).

But that distorts the proper analysis. What is really at the heart of plaintiffs' claim is that Authority's permit requirement, the enforcement of which resulted in plaintiffs' inability to demonstrate at Navy Pier or Gateway Park, violates the First Amendment. Hence the relevant question for qualified immunity purposes is whether Andrews was reasonable in believing that the permit policy and its enforcement were constitutionally permissible.

Our Court of Appeals has declined to address whether Authority's regulation of activity in Gateway Park violates any First Amendment principles (see Chicago Acorn, 150 F.3d at 703). How then can it be said that defendants' enforcement of that regulation violated a "clearly well established" constitutional right? That plainly calls for a "no way" answer, further

fortified by cases that have upheld other permit requirements in public parks and areas (see, e.g., Thomas, 534 U.S. at 324-25; Blue Canary, 251 F.3d at 1123).

As for plaintiffs' Fourth Amendment claims, when an officer asserts qualified immunity in defense of an unlawful arrest claim the court must "determine if the officer actually had probable cause or, if there was no probable cause, whether a reasonable officer could have mistakenly believed that probable cause existed" (Humphrey v. Staszak, 148 F.3d 719, 725 (7th Cir. 1998)). Humphrey, id. at 726 goes on to explain:

> Even if probable cause is lacking with respect to an arrest, despite an officer's subjective belief that he had probable cause, he is entitled to immunity as long as his subjective belief was objectively reasonable.

As already demonstrated in the substantive discussion of James' arrest and Marcavage's detention at Navy Pier, criminal trespass occurs when an individual remains on another's land after being asked by the owner or occupier or an officer to depart. James and Marcavage did just that by refusing to obey Navy Pier's security guards' and Andrews' directives to leave the area. Plaintiffs identify no case law that makes it clear that the permit requirement at Navy Pier or Gateway Park was impermissible or invalid or that the Illinois criminal trespass statute did not apply to Authority's property. And that failure confirms Andrews' entitlement to qualified immunity for his conduct there.

31

Finally, as to Teneyuque's and Madrigal's arrest of Marcavage at Wrigley Field, the fact that the Illinois disorderly conduct statute is itself vague as to the definition of such conduct supports a broad reading the statute. As <u>Humphrey</u>, <u>id</u>. at 727 instructs, "in the context of an arrest for disorderly conduct, the doctrine of qualified immunity should provide broad protection from suit where the facts show that in addition to loud argument, such factors as time, place, circumstances, and conduct other than arguing, support probable cause."

In light of that standard, as well as several cases holding that blocking pedestrian traffic can in fact constitute disorderly conduct (see <u>Jones</u>, 106 F.3d at 779 and cases cited there), Teneyuque and Madrigal could reasonably have believed that probable cause existed to arrest Marcavage for disorderly conduct. So they too did not violate any of Marcavage's "clearly established" rights under the Fourth Amendment, and they too are entitled to qualified immunity for their actions.

## Conclusion

This excursion through all of plaintiffs' federal claims has been extraordinarily lengthy, and an independent inquiry into plaintiffs' state law claims could well require further extended analysis. Hence this Court exercises its established discretion to eschew the exercise of supplemental jurisdiction over those claims (see, e.g., such cases as <u>Williams v. Rodriquez</u>, 509 F.3d

392, 404 (7th Cir. 2007) and <u>Wright v. Associated Ins. Cos.</u>, 29 F.3d 1244, 1251 (7th Cir. 1994)).

With no genuine issues of material (that is, outcome-determinative) fact existing as to plaintiffs' federal claims, defendants are entitled to a judgment as a matter of law. Accordingly defendants' Rule 56 motion for summary judgment on plaintiffs' federal claims is granted, while plaintiffs' cross-motion is denied and their state law claims are denied without prejudice.

This action is therefore dismissed as to City and its police personnel codefendants, and this Court determines pursuant to Rule 54(b) that there is no just reason for delay, so that a final judgment is ordered as to those defendants.  That leaves this action pending only as between plaintiffs and Authority, whose disputes have been referred to Magistrate Judge Michael Mason.

_____
Milton I. Shadur
Senior United States District Judge

Date:  July 20, 2009